# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| **PHARMACEUTICAL RESEARCH** | : | |
| **AND MANUFACTURERS OF AMERICA** | : | |
| *Plaintiff*, | : | |
| | : | |
| **v.** | : | **C.A. No.: 1:25-cv-00501** |
| | : | |
| **PETER F. NERONHA, in his official** | : | |
| **capacity as ATTORNEY GENERAL OF** | : | |
| **RHODE ISLAND, *et al.*,** | : | |
| *Defendants,* | : | |

## DEFENDANTS' MEMORANDUM IN OBJECTION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................... ii

INTRODUCTION ......................................................................................................... 1

BACKGROUND ........................................................................................................... 2

   I.    Federal Statutory Background ........................................................................ 2

   II.   The Purpose of the 340B Program is to Increase Patient Access to Care ..................... 4

   III.  Contextualizing Recent Challenges to 340B Access ........................................ 6

   IV.  Rhode Island's Affordable Drugs Act ............................................................ 8

   V.   Previous Challenges to Chapter 288 ............................................................ 13

ARGUMENT ............................................................................................................... 14

   I.    Standard of Review ...................................................................................... 14

   II.   PhRMA Fails to Establish a Likelihood of Success on the Merits ............................... 15

       A.   Laws Passed Pursuant to Congress' Spending Powers do not Automatically Preempt State Laws ...................................................................................... 15

       B.   PhRMA Fails to Overcome the Presumption Against Preemption as Chapter 288 is a Lawful Exercise of the State's Historic Police Powers ......................................... 22

       C.   Section 340B does not Preempt Chapter 288 under Field Preemption ................. 24

       D.   Section 340B does not Preempt Chapter 288 under Conflict Preemption ........... 29

         1. "Expands Federal 340B Obligations" ..................................................... 32

         2. "Access to Claims Data" ....................................................................... 36

         3. "The Rebate Model" ............................................................................. 41

         4. "The Federal Enforcement Regime" ....................................................... 43

   III.  PhRMA Fails to Demonstrate the Remaining Preliminary Injunction Factors ........... 47

       A.   No Irreparable Injury ................................................................................ 48

       B.   The Balance of Equities and Public Interest Heavily Favor Defendants .............. 52

CONCLUSION ............................................................................................................ 56

# TABLE OF AUTHORITIES

**Cases**

*AbbVie, Inc. v. Fitch*, 152 F.4th 635 (5th Cir. 2025) .......................................................... 1, 24, 25

*AbbVie, Inc. v. Fitch*, No. 1:24-cv-184, 2024 WL 3503965 (S.D. Miss. July 22, 2024),
    *aff'd*, 152 F.4th 635 (5th Cir. 2025) ............................................................................................... 1

*AbbVie, Inc. v. Skrmetti*, No. 3:25-cv-00519, 2025 WL 1805271 (M.D. Tenn. June 30, 2025) ..... 1

*AbbVie, Inc. v. Weiser,* No. 25-cv-1847-WJM-KAS, *Order Denying Plaintiffs' Motion for a
    Preliminary Injunction*, ECF 115 (D. Colo. Oct. 31, 2025) ..................................................... 1

*Alharbi v. Beck*, 62 F. Supp. 3d 202 (D. Mass. 2014) ..................................................................11

*Allen v. FamilyCare, Inc.*, 812 F. App'x 413 (9th Cir. 2020), *as amended* (May 7, 2020).......... 27

*American Hosp. Ass'n v. Becerra*, 596 U.S. 724 (2022)...................................................................... 4

*American Trucking Ass'n, Inc. v. Rhode Island Tpk. & Bridge Auth.*, 123 F.4th 27
    (1st Cir. 2024) ................................................................................................................................... 31

*Arizona v. United States*, 567 U.S. 387 (2012) ......................................................................... 23, 24

*Association to Pres. & Protect Loc. Livelihoods v. Sidman*, 147 F.4th 40 (1st Cir. 2025) .......... 35

*Astra USA, Inc. v. Santa Clara Cnty.*, 563 U.S. 110 (2011)........................................................ 18

*AstraZeneca Pharms. LP v. Fitch*, 766 F. Supp. 3d 657 (S.D. Miss. 2024)................................... 1

*Barnett Bank v. Nelson*, 517 U.S. 25 (1996)................................................................................ 32

*Boyle v. United Tech. Corp.*, 487 U.S. 500 (1988)....................................................................... 16

*Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341 (2001).............................................. 16

*California v. ARC Am.Corp.,* 490 U.S. 93 (1989).......................................................................... 29

*Capron v. Attorney Gen.*, 944 F.3d 9 (1st Cir. 2019) ............................................................. 23, 29

*Chamber of Commerce of U.S. v. Whiting*, 563 U.S. 582 (2011)....................................... 20, 21, 31

*Christensen v. Harris Cnty.*, 529 U.S. 576 (2000). ........................................................................ 8

*CoreCivic, Inc. v. Governor of N.J.,* 145 F.4th 315 (3d Cir. 2025)............................................... 17

*Crandall v. Nevada*, 73 U.S. (6 Wall.) 35 (1867)........................................................................ 19

*Crosby v. National Foreign Trade Council*, 563 U.S. 363 (2000) ................................................ 32

*CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69 (1987)........................................................... 34

*DiBiase v. SPX Corp*, 872 F.3d 224 (4th Cir. 2017) ................................................................... 49

*Does 1-6 v. Mills*, 16 F.4th 20 (1st Cir. 2021) ........................................................................... 53

*Eli Lilly & Co. v. Kennedy*, No. 24-cv-03220, 2025 WL 1423630 (D.D.C. May 15, 2025) ........ 39

*Figueroa v. Foster*, 864 F.3d 222 (2d Cir. 2017) ........................................................................ 23

*Gade v. National Solid Wastes Mgmt. Ass'n*, 505 U.S. 88 (1992) .......................................... 15, 21

*Genesis Health Care, Inc. v. Becerra*, 701 F. Supp. 3d 312 (D.S.C. 2023) ................................. 30

*Gent v. Mutual Ins. Soc'y*, 611 F.3d 79 (1st Cir. 2010)................................................................11

*Hanson v. D.C.*, 120 F.4th 223 (D.C. Cir. 2024), *cert. denied*, No. 24-936, 2025 WL 1603612
    (U.S. June 6, 2025) ......................................................................................................................... 52

*Hillsborough Cnty. v. Automated Med. Labs., Inc.*, 471 U.S. 707 (1985)....................................... 20

*Hines v. Davidowitz*, 312 U.S. 52 (1941)..................................................................................... 29

*Huron Portland Cement Co. v. Detroit,* 362 U.S. 440 (1960) ............................................... 15, 47

*In re Pharm. Indus. Average Wholesale Price Litig.*, 582 F.3d 156 (1st Cir. 2009) ... 17, 22, 33, 34

*Johnson & Johnson Health Care Sys. Inc. v. Kennedy,* No. CV 24-3188, 2025 WL 1783901 (D.D.C. June 27, 2025), *appeal filed*, (D.C. Cir. Jun. 30, 2025) ........................... 21

*Jordache Enters., Inc. v. Levi Strauss & Co.,* 841 F. Supp. 506 (S.D.N.Y. 1993) ................. 51

*Kroske v. U.S. Bank Corp.,* 432 F.3d 976 (9th Cir. 2005), *as amended* (Feb. 13, 2006) ............. 23

*Laccinole v. Appriss, Inc.,* 453 F.Supp.4d 499 (D.R.I. 2020) ........................................11

*Maryland v. King,* 567 U.S. 1301 (2012)............................................................ 52

*Maryland v. Louisiana,* 451 U.S. 725 (1981) ...................................................... 15

*Medtronic, Inc. v. Lohr,* 518 U.S. 470 (1996)....................................................... 16

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bishop*, 839 F. Supp. 68 (D. Me. 1993)............. 49

*Morales v. Trans World Airlines, Inc.,* 504 U.S. 374 (1992) ....................................... 31

*Moyle v. United States,* 603 U.S. 324 (2024)........................................................ 21

*National Foreign Trade Council v. Natsios*, 181 F.3d 38 (1st Cir. 1999), *aff'd sub nom, Crosby v. National Foreign Trade Council*, 563 U.S. 363 (2000). ........................................ 16

*New Comm Wireless Servs., Inc. v. SprintCom, Inc.*, 287 F.3d 1 (1st Cir. 2002)....................... 14

*New Motor Vehicle Bd. of Col. v. Orrin W. Fox Co.*, 434 U.S. 1345 (1977) ............................. 52

*Nken v. Holder*, 556 U.S. 418 (2009)................................................................ 14

*Novartis Pharms. Corp. v. Fitch,* 738 F. Supp. 3d 737 (S.D. Miss.), *appeal filed*, (5th Cir. July 9, 2024) .................................................... 2, 26, 27, 44

*Novartis v. Drummond,* No. CIV-25-727-PRW, *Order* (W.D. Okla. Oct. 31, 2025) ................... 2

*O'Brien v. Mass. Bay Transp. Auth.*, 162 F.3d 40 (1st Cir. 1998)..................................... 21

*Ocean State Tactical, LLC v. Rhode Island*, 646 F. Supp. 3d 368 (D.R.I. 2022), *aff'd*, 95 F.4th 38 (1st Cir. 2024) .................................................. 48

*OfficeMax Inc. v. County Qwick Print, Inc.*, 709 F. Supp. 2d 100 (D. Me. 2010)....................... 48

*Oklahoma Tax Comm'n v. Texas Co.*, 336 U.S. 342 (1949)............................................ 22

*Oneok, Inc. v. Learjet, Inc.,* 575 U.S. 373 (2015) .................................................. 29

*Or. Health & Sci. Univ. v. Engels*, No. 24-cv-2184, 2025 WL 1707630 (D.D.C. June 17, 2025) ................................................................ 38

*Osborn* v. *Bank of U.S.*, 22 U.S. (9 Wheat.) 738 (1924) .............................................. 18

*Peoples Fed. Sav. Bank v. People's United Bank*, 672 F.3d 1 (1st Cir. 2012)...................... 14, 56

*Pharm. Care Mgmt. Ass'n v. Wehbi*, 18 F. 4th 956 (8th Cir. 2021)..................................... 23

*Pharm. Corp. v. Bailey*, No. 2:24-cv-04131, 2025 WL 489881 (W.D. Mo. Feb. 24, 2025), *appeal filed*, (8th Cir. Mar. 28, 2025) .......................................................... 1

*PhRMA v. Concannon*, 249 F.3d 66 (1st Cir. 2001), *aff'd sub nom. PhRMA v. Walsh*, 538 U.S. 644 (2003)........................................................... 14, 24

*PhRMA v. Fitch*, No. 1:24-cv-160, 2024 WL 3277365 (S.D. Miss. July 1, 2024), *appeal filed*, (5th Cir. July 5, 2024) ........................................................... 1

*PhRMA v. McClain*, 645 F. Supp. 3d 890 (E.D. Ark. 2022), *aff'd*, 95 F. 4th 1136 (8th Cir.), *cert. denied.*, 145 S. Ct. 768 (2024) .................................................. 2

*PhRMA v. Morrissey*, 760 F. Supp. 3d 439 (S.D.W. Va. 2024), *appeal filed*, (4th Cir. Jan. 16, 2025)........................................................... 2

*PhRMA v. Murrill*, No. 6:23-cv-997, 2024 WL 4361597 (W.D. La. Sept. 30, 2024).................... 1

*Public Service Co. of N.H. v. Town of West Newbury*, 835 F.2d 380 (1st Cir. 1987)................ 48

*Renegotiation Bd. v. Bannercraft Clothing Co.*, 415 U.S. 1 (1974)............................... 49

*Rhode Island Coalition Against Domestic Violence v. Bondi*, No. 25-279, 2025 WL 2271867 (D.R.I. Aug. 8, 2025) ............................................................................................................ 14

*Rice v. Norman Williams Co.*, 458 U.S. 654 (1982) ............................................................... 41

*Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218 (1947)..................................................... 24, 25

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12 (1st Cir. 1996).............................. 50

*Ruckelshaus v. Monsanto Corp.*, 467 U.S. 986 (1984) ................................................................ 51

*Rushia v. Town of Ashburnham*, 701 F.2d 7 (1st Cir. 1983)........................................................ 48

*Ryan v. U.S. Immigration & Customs Enforcement,* 974 F.3d 9 (1st Cir. 2020).......................... 14

*Schafer v. Am. Cyanamid Co.*, 20 F.3d 1 (1st Cir. 1994) ..................................................... 33, 34

*Semaphore Entertainment Group Sports Corp. v. Gonzalez*, 919 F. Supp. 543 (D.P.R. 1996)..... 49

*South Carolina v. Baker*, 485 U.S. 505 (1985) ......................................................................... 18

*Stasiukevich v. Nicolls,* 168 F.2d 474 (1st Cir. 1948)................................................................11

*Together Emps. v. Mass Gen. Brigham Inc.*, 32 F.4th 82 (1st Cir. 2022).............................. 14, 49

*Union Pac. R. Co. v. Peniston*, 85 U.S. 5(1873)....................................................................... 19

*United States v. Bass*, 404 U.S. 336 (1971) ............................................................................. 15

*United States v. Boyd*, 378 U.S. 39 (1964) ............................................................................... 18

*United States v. New Mexico*, 455 U.S. 720 (1982) .................................................................. 18

*United States v. Salerno*, 481 U.S. 739 (1987) ....................................................................... 15

*United States v. Washington*, 596 U.S. 832 (2022) ................................................................... 19

*Virginia Uranium, Inc. v. Warren*, 587 U.S. 761 (2019) ...................................................... 33, 35

*Wine & Spirits Retailers, Inc. v. Rhode Island & Providence Plantations*, 364 F. Supp.2d 172 (D.R.I. 2005) ............................................................................................................................ 51

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) ......................................................... 14

*Wisconsin Dep't of Indus., Labor & Human Relations v. Gould, Inc.,* 475 U.S. 282 (1986) ....... 33

*Wisconsin Pub. Intervenor v. Mortier*, 501 U.S. 597 (1991)..................................................... 25

*Wyeth v. Levine*, 555 U.S. 555 (2009) ............................................................................... 22, 23

## Statutes

24-A Me. Rev. Stat. ch. 103 (2025) ........................................................................................... 9

42 U.S.C. §§ 1396r-8(a)(1), (5) .................................................................................................. 3

42 U.S.C. § 256b(a)(4).............................................................................................................. 3

42 U.S.C. § 256b(a)(5)(A)(i) ..................................................................................................... 5

42 U.S.C. § 256b(a)(5)(B) .................................................................................................... 5, 8

42 U.S.C. § 256b(d)(3)(B)(iv) ................................................................................................... 6

Ark. Code Ann. § 23-92-604(c) (2021) ...................................................................................... 9

La. Rev. Stat. Ann. §§ 40:2884-2885 (2023) ............................................................................. 9

Md. Code Ann. § 12-6C-09.1 (2024)......................................................................................... 9

Minn. Stat. Ann. § 62J.96 (2024)............................................................................................... 9

Miss. Code Ann. § 41-149-7 (2024) .......................................................................................... 9

Mo. Ann. Stat. § 376.414 (2024) ............................................................................................... 9

R.I. Gen Laws §§ 5-19.3-1 through 5-19.3-9 ............................................................................. 9

R.I. Gen. Laws § 5-19.3-3(a) ................................................................................................... 45

R.I. Gen. Laws § 5-19.3-8....................................................................................................... 45

R.I. Gen. Laws § 5-19.3-9(b) ................................................................................................ 46
R.I. Gen. Laws § 6-13.1 ......................................................................................................... 10
S.B. 28, 2023-2024 Leg., Reg. Sess. (Kan. 2024) .................................................................. 9
W. Va. Code § 60A-8-6a(b)(1) (2024) .................................................................................... 9

## Regulations

61 Fed. Reg. 43,550 ................................................................................................................ 7
61 Fed. Reg. 55,156, 55,157-58 ............................................................................................. 5
61 Fed. Reg. 65,406, 65,410 (Dec. 12, 1996) ........................................................................ 6
89 Fed. Reg. 28,643, 28,644 (Apr. 19, 2024) ........................................................................ 5

## Rules

HRSA, Notice Regarding 340B Drug Pricing Program-Contract Pharmacy Services, 75 Fed.
    Reg. 10,272, 10,273 (March 5, 2010) ................................................................................ 7
HRSA, Notice Regarding 340B Drug Pricing Program-Contract Pharmacy Services, 75 Fed.
    Reg. 10,273 (March 5, 2010) ....................................................................................... 6, 29
HRSA, Notice Regarding Section 602 of the Veterans Health Care Act of 1992 Patient and Entity
    Eligibility, 61 Fed. Reg. 55,156, 55,157-58 (Oct. 24, 1996) ................................... 5, 46
HRSA, Notice Regarding Section 602 of the Veterans Health Care Act of 1992; Contract
    Pharmacy Services, 61 Fed. Reg. 43,549 (Aug. 23, 1996) ................................................ 7

## Treatises

9A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2409 (3d ed.).......11
9A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2948.1 (3d ed.)... 48

## Other Authorities

A. Dobson et al., 340B DSH Hospitals Serve Higher Share of Patients with Low Incomes, at
    (Sept. 26, 2022) .................................................................................................................. 4
Black's Law Dictionary (12th ed. 2024) ............................................................................... 43
H.R. Rep. No. 102–384(II) (1992) ........................................................................................ 25
H.R. Rep. No. 102–384(II), at 11 ........................................................................................... 4
H.R. Rept. No. 102–384(II) ..................................................................................................... 3
H.R. Rep. No. 102–384(II), at 12 (1992) ................................................................................ 3
HRSA, PPA Example, Article II, Section (a) .......................................................................... 4
J. Williams, *Four changes coming to health care in Rhode Island from the General Assembly*,
    Prov. J. (June 24, 2025) ...................................................................................................... 10

# INTRODUCTION

This is the third challenge brought by pharmaceutical manufacturers or their representatives to the constitutionality of Rhode Island's recently enacted *Defending Affordable Prescription Drug Costs Act*. 2025 Public Laws, Ch. 288 ("Chapter 288" or the "Act").[1] The Act, which took effect on October 1, 2025, prevents manufacturers from unilaterally imposing restrictions on where drugs prescribed to patients receiving care at Rhode Island safety-net health care providers that participate in the federal 340B Program may be delivered. On September 30, 2025, this Court denied preliminary injunctive relief on the same legal claim (federal preemption) as the plaintiff in this action, Pharmaceutical Research and Manufacturers Association of America (PhRMA), repeats in its motion. Ex. 1 at 55-56. This Court's denial of injunctive relief was consistent with a growing list of circuit court and district court opinions rejecting substantively identical requests for injunctive relief seeking to enjoin state officials, like the defendants in this case, from enforcing similar state laws on preemption and other constitutional grounds.[2]

---

[1] The two related cases are *Novartis v. Neronha*, Civil Action No. 1:25-cv-387 and *AbbVie v. Neronha*, Civil Action No. 1:25-cv-0388. A copy of the Court's decision denying injunctive relief in the related cases is attached as Exhibit 1.

[2] *See, e.g.*, *AbbVie, Inc. v. Fitch*, 152 F.4th 635 (5th Cir. 2025) (affirming denial of injunctive relief on manufacturer's preemption claims); *PhRMA v. McClain*, 95 F.4th 1136, 1143-46 (8th Cir.) (rejecting manufacturer's federal preemption claim), *cert. denied*, 145 S. Ct. 768 (2024); *AbbVie, Inc. v. Weiser*, No. 25-cv-1847-WJM-KAS, *Order Denying Plaintiffs' Motion for a Preliminary Injunction*, ECF 115 (D. Colo. Oct. 31, 2025); *Novartis Pharm. Corp. v. Frey*, No. 1:25-CV-00407-JCN, 2025 WL 2813787, at *7 (D. Me. Sept. 23, 2025) (denying injunctive relief including on preemption and other claims), *appeal filed*, (1st Cir. Sept. 26, 2025); *AbbVie, Inc. v. Skrmetti*, No. 3:25-cv-00519, 2025 WL 1805271, at **11-18, n.84, **22-23 (M.D. Tenn. June 30, 2025) (denying injunctive relief); *Novartis Pharm. Corp. v. Bailey*, No. 2:24-cv-04131, 2025 WL 489881 (W.D. Mo. Feb. 24, 2025) (same), *appeal filed*, (8th Cir. Mar. 28, 2025); *AstraZeneca Pharms. LP v. Fitch*, 766 F. Supp. 3d 657,660 (S.D. Miss. 2024) (same); *PhRMA v. Murrill*, No. 6:23-cv-997, 2024 WL 4361597 (W.D. La. Sept. 30, 2024) (granting state's motion for summary judgment on manufacturer's federal preemption claim); *AbbVie, Inc. v. Fitch*, No. 1:24-cv-184, 2024 WL 3503965 (S.D. Miss. July 22, 2024) (denying injunctive relief), *aff'd*, 152 F.4th 635 (5th Cir. 2025); *PhRMA v. Fitch*, No. 1:24-cv-160, 2024 WL 3277365 (S.D. Miss. July 1, 2024) (same),

Although PhRMA's motion was filed after this Court issued its decision in the two related cases, PhRMA does not even mention the decision in its motion. Nor does it make any meaningful effort to distinguish the multiple other decisions rejecting similar claims filed by it or its members, including Novartis—plaintiff in one of related cases before this Court. *See* https://phrma.org/about; ECF 11-2 at ¶ 4 (listing Novartis as one of PhRMA's "current members"). Given the overwhelming weight of authority against the arguments PhRMA resurrects in its motion, PhRMA cannot discharge its burden of demonstrating a likelihood of success on the merits of its federal preemption claim. This Court and multiple other federal courts confronting similar challenges have rejected the same legal arguments PhRMA presents in support of its motion. Additionally, PhRMA fails to demonstrate any risk of irreparable harm attributable to the defendants' potential enforcement Chapter 288. And any risk of potential harm is heavily outweighed by the public interest in ensuring that Chapter 288's prohibition on manufacturer-imposed restrictions on where medications prescribed by Rhode Island safety-net health care providers under the 340B Program may be delivered.

## BACKGROUND

### I.    Federal Statutory Background

In 1992, Congress established the 340B Program through the Veteran's Health Care Act (Pub. L. 102-585) with the purpose of supporting our nation's critical safety net facilities. *See*

---

*appeal filed*, (5th Cir. July 5, 2024); *Novartis Pharms. Corp. v. Fitch*, 738 F. Supp. 3d 737, 753 (S.D. Miss.) (same), *appeal filed*, (5th Cir. July 9, 2024); *PhRMA v. McClain*, 645 F. Supp. 3d 890, 901 (E.D. Ark. 2022) (granting state's motion for summary judgment on manufacturer's federal preemption claim), *aff'd*, 95 F. 4th 1136 (8th Cir.), *cert. denied.*, 145 S. Ct. 768 (2024). The only exceptions are *PhRMA v. Morrissey*, 760 F. Supp. 3d 439 (S.D.W. Va. 2024), *appeal filed*, (4th Cir. Jan. 16, 2025), and *Novartis v. Drummond*, No. CIV-25-727-PRW, *Order* (W.D. Okla. 31 Oct. 2025), ECF 59, a recent case largely adopting *Morrissey*'s reasoning on plaintiffs' preemption claim. Tellingly, other district courts, including this Court, have expressly declined to follow *Morrissey*'s reasoning. *See* Ex. 1 at 54-55; *Skrmetti*, 2025 WL 1805271, at *18, n. 11; *Fitch*, 766 F. Supp. 3d at 668.

H.R. Rep. No. 102–384(II), at 12 (1992) ("In giving these 'covered entities' access to price reductions, the Committee intends to enable these entities to stretch scarce Federal resources as far as possible, reaching more eligible patients and providing more comprehensive services."). The 340B Program achieves this purpose by lowering the cost of covered outpatient drugs ("CODs") that qualifying facilities and clinics purchase from drug manufacturers. Section 340B defines "covered entities" to consist of a limited category of facilities and clinics, including federally qualified health centers and Ryan White HIV-AIDS clinics that tend to be reliant on federal grant funding, children's hospitals and critical access hospitals, and certain hospitals that are government- or non-profit owned and that serve a disproportionate share of Medicare/Medicaid patients or contract with state or local governments to provide services to low-income individuals not eligible for Medicare/Medicaid. *See* 42 U.S.C. § 256b(a)(4).

Drug manufacturers are not obligated to participate in the 340B Program – manufacturers are only required to participate in the 340B Program if they want their CODs reimbursed by Medicaid and Medicare Part B. *See Sanofi*, 58 F.4th at 699 ("The federal government ... uses that market power to get drug makers to subsidize healthcare"); 42 U.S.C. §§ 1396r-8(a)(1), (5). In this sense, a manufacturer's participation in the 340B Program is part of the calculus they make when deciding they want to market their products to federally insured patients.

HHS operationalizes the 340B Program by requiring manufacturers to execute a Pharmaceutical Pricing Agreement ("PPA"), which requires "that the manufacturer offer each covered entity covered outpatient drugs for purchase at or below the applicable ceiling price." 42 U.S.C. § 256b(a)(1). The statute applies this "340B ceiling price" to "covered outpatient drugs . . . purchased by a covered entity." 42 U.S.C. § 256b(a)(1). The standard terms of the PPA mirror these statutory provisions, making the 340B ceiling price available to covered entities and

outlining a series of "manufacturer responsibilities," including the manufacturer's obligation to "to charge covered entities a price for each unit of the drug that does not exceed an amount equal to [the 340B ceiling price]." *See* HRSA, PPA Example, Article II, Section (a), https://www.hrsa.gov/sites/default/files/hrsa/opa/pharmaceutical-pricing-agreement-example.pdf.

Importantly, neither Section 340B nor the PPA address the delivery of drugs or the method by which covered entities may acquire drugs subject to the 340B ceiling price. *See McClain,* 95 F.4th at 1143 ("[T]he text of 340B 'is silent about delivery' of drugs to patients.") (quoting *Sanofi,* 58 F.4th at 703).

## II.     The Purpose of the 340B Program is to Increase Patient Access to Care

The 340B Program provides vital benefits to Rhode Island patients through the covered entities that are eligible to receive 340B pricing. By reducing the exorbitant cost of acquiring drugs for 340B-eligible patients, covered entities can use the savings to maintain or expand access to programs and services, or to cover the costs of uncompensated or undercompensated care. *See American Hosp. Ass'n v. Becerra*, 596 U.S. 724, 739 (2022) (striking down revised hospital payment rates that would have "eliminate[d] the federal subsidy that has helped keep 340B hospitals afloat"); H.R. Rep. No. 102-384(II), at 11 (observing an increase in outpatient drug prices in the run-up to enactment of Section 340B and noting that these increases had "reduced the level of services and the number of individuals that these hospitals and clinics are able to provide with the same level of resources"). As a class, covered entities share one essential trait: they tend to treat needier communities, such as "low-income and rural communities," *id.* at 739, and focus their services on historically underserved populations. *See* A. Dobson et al., 340B DSH Hospitals Serve Higher Share of Patients with Low Incomes, at (Sept. 26, 2022), https://www.340bhealth.org/files/340B_and_Low_Income_Populations_Report_2022_FINAL.pd

f ("[T]he low-income share for 340B DSH hospitals in 2020 was 55.0% higher than the low-income share for non-340B hospitals.").

Rather than being divorced from patients as PhRMA claims, 340B discount eligibility is based on the identity of the patient because covered entities can only claim 340B discounts for dispenses to individuals who are "patients of the entity." 42 U.S.C. § 256b(a)(5)(B) ("[w]ith respect to any covered outpatient drug that is subject to an agreement under this subsection, a covered entity shall not resell or otherwise transfer the drug to a person who is not a patient of the entity"); *see also* HRSA, Notice Regarding Section 602 of the Veterans Health Care Act of 1992 Patient and Entity Eligibility ("1996 Guidance"), 61 Fed. Reg. 55,156, 55,157-58 (Oct. 24, 1996) (defining eligible 340B "patients" based on a three-part test).[3] Contrary to PhRMA's portrayal of the 340B Program as unbounded absent its own unilaterally imposed restrictions, covered entities are required to ensure that 340B discounts are only claimed for qualifying "patients of the [covered] entity,"[4] and HRSA has acknowledged that covered entities' ability to use contract pharmacies can

---

[3] HRSA's 1996 guidance defining "patient" for 340B purposes states that an individual is a "patient" of the covered entity only if all of the following three prongs are satisfied: "(1) the covered entity has established a relationship with the individual, such that the covered entity maintains records of the individual's health care; and (2) the individual receives health care services from a health care professional who is either employed by the covered entity or provides health care under contractual or other arrangements (e.g. referral for consultation) such that responsibility for the care provided remains with the covered entity; and (3) the individual receives a health care service or range of services from the covered entity which is consistent with the service or range of services for which grant funding or Federally-qualified health center look-alike status has been provided to the entity. Disproportionate share hospitals are exempt from this [third] requirement." 61 Fed. Reg. 55,156, 55,157-58.

[4] Covered entities are subject to potential enforcement action from HRSA, including removal from the program, if they are found to have diverted 340B discounts or claimed duplicative discounts. *See* 42 U.S.C. § 256b(a)(5)(B) (defining diversion as "resell[ing] or otherwise transfer[ing] the drug to a person who is not a patient of the entity"); *id.* § 256b(a)(5)(A)(i). HRSA is authorized to audit covered entities for compliance with these provisions. *Id.* § 256b(a)(5)(C); 340B Drug Pricing Program; Administrative Dispute Resolution Regulation, 89 Fed. Reg. 28,643, 28,644 (Apr. 19, 2024) ("On average, HRSA conducts 200 covered entity audits each fiscal year including child/associate sites and contract pharmacies

play an important role in promoting patient access to the medications they need. *See* HRSA, Notice Regarding 340B Drug Pricing Program-Contract Pharmacy Services, 75 Fed. Reg. 10,273 (March 5, 2010) (observing that, because of obstacles to filling prescriptions, such as transportation barriers, "[i]t would be a significant benefit to patients to allow the use of more easily accessible, multiple contract pharmacy arrangements by covered entities"). In short, impeding 340B-eligible patients' ability to fill their medications at pharmacies that have contracted with the covered entity for this purpose can have a very real adverse impact on patients – including burdening patients with having to travel to different pharmacies to receive their medications.

## III.    Contextualizing Recent Challenges to 340B Access

The arc of Section 340B caselaw shows that manufacturers have sought to chip away at the scope of the 340B Program, first by challenging federal agencies' authority to administer the program, then reversing course and complaining when states began using their traditional police powers to fill the gaps in the 340B statute exploited by manufacturers. 340B contract pharmacies provide a key example.

As the 340B statute makes no reference to pharmacies, HHS's longstanding policy in the face of this statutory silence has required manufacturers to offer the 340B ceiling price to a covered entity even when the covered entity fills the prescription through a contract pharmacy. In 1996, HRSA issued its first guidance on the use of contract pharmacies. *See* HRSA, Notice Regarding

---

associated with the covered entities."). Manufacturers may also utilize HRSA's administrative dispute resolution (ADR) process to contest compliance with 340B Program requirements, provided they first audit the covered entity. *Id.* § 256b(d)(3)(B)(iv). To initiate an audit, the manufacturer "must set forth a clear description of why it has reasonable cause to believe that a violation of section 340B(a)(5) (A) or (B) has occurred, along with sufficient facts and evidence in support of the belief;" HRSA then reviews this documentation and, if the agency finds "there is reasonable cause," it "will not intervene" in the audit. *See* Manufacturer Audit Guidelines and Dispute Resolution Process, 61 Fed. Reg. 65,406, 65,410 (Dec. 12, 1996).

Section 602 of the Veterans Health Care Act of 1992; Contract Pharmacy Services, 61 Fed. Reg. 43,549 (Aug. 23, 1996). Observing that most covered entities had to rely on outside pharmacies to dispense the drugs ordered or prescribed to their patients, and that covered entities already had "an existing right ... under State law" to "contract with retail pharmacies for the purpose of dispensing 340B drugs[,]" HRSA endorsed covered entities' use of contract pharmacies as a mechanism to ensure access to 340B-discounted drugs. *Id.* at 43,550.[5] In 2010, HRSA reaffirmed its longstanding position on contract pharmacies, expressly authorizing a covered entity's existing right to choose multiple contract pharmacies to dispense its medications. *See* HRSA, Notice Regarding 340B Drug Pricing Program-Contract Pharmacy Services, 75 Fed. Reg. 10,272, 10,273 (March 5, 2010). HRSA noted that "[i]t would be a significant benefit to patients to allow the use of more easily accessible, multiple contract pharmacy arrangements by covered entities. This would permit covered entities to more effectively utilize the 340B program and create wider patient access by having more inclusive arrangements in their communities which would benefit covered entities, pharmacies and patients served." *Id.*

But drug makers participating in the 340B Program have unilaterally sought to restrict covered entities' right to contract with and use contract pharmacies, thereby blocking health care providers' access to revenue associated with "patients of the [covered] entity", 42 U.S.C. §

---

[5] HRSA's 1996 contract pharmacy guidance was also partly justified by allusion to covered entities' preexisting rights under state law to engage contracted pharmacies, which HRSA agreed provided a legal foundation subject only to the federal law's restrictions on diversion and duplication. *See* 61 Fed. Reg. 43,550 ("*Comment*: As a matter of law, entities possess the right to hire retail pharmacies to act as their agents in providing pharmaceutical care to their patients . . . . By issuing guidelines in this area, [HRSA's Office of Drug Pricing] is not seeking to create a new right but rather is simply recognizing an existing right that covered entities enjoy under State law. *Response*: We agree. However, entities, under any distribution system, must comply with the statutory prohibition against diversion of 340B drugs to individuals who are not patients of the covered entities. Further, the dispensing of drugs, purchased with a 340B discount, must not result in the generation of a Medicaid rebate.").

256b(a)(5)(B), based solely on which pharmacy fills a script. Starting in 2020, manufacturers – including PhRMA members – began to impose limitations on covered entities' use of contract pharmacies. *See Johnson*, 102 F.4th at 458; ECF 11-5 at ¶14. Manufacturers sued HHS in response to its advisory opinion and enforcement letters against manufacturers requiring the delivery of drugs to any contract pharmacy with which the covered entity chooses to partner. *See Johnson,* 102 F.4th 452; *Sanofi,* 58 F.4th 696. Two Courts of Appeals decisions later, manufacturers succeeded in forcing HHS/HRSA to abandon its guidance requiring manufacturers to honor covered entities' contract pharmacy arrangements. *Id.* Importantly, these decisions do not address preemption of state law, nor any of PhRMA's other legal claims here; rather, these decisions merely speak to what federal law does <u>not</u> do – prohibit manufacturers from adopting reasonable limitations on the use of contract pharmacies. *See Johnson*, 102 F.4th at 464 ("In sum, we hold that section 340B does not categorically prohibit manufacturers from imposing conditions on the distribution of covered drugs to covered entities. . . We do not foreclose the possibility that other, more onerous conditions might violate the statute."); *Sanofi*, 58 F.4th at 704 ("Unless Section 340B '*prohibits*' drug makers from adopting their policies, HHS cannot show that they have violated Section 340B. . . . Because Section 340B 'contains no such prohibition,' the drug makers' policies are lawful.") (quoting *Christensen v. Harris Cnty.*, 529 U.S. 576, 588 (2000)). Yet, as discussed below, PhRMA attempts to convert Section 340B's silence into an affirmative authorization under federal law to restrict the use of contract pharmacies or impose data-submission requirements on covered entities as a condition of accessing 340B drugs.

## IV.    Rhode Island's Affordable Drugs Act

Following the *Johnson* and *Sanofi* decisions, states began enacting their own legislation prohibiting pharmaceutical manufacturers from restricting a covered entity's reliance on contract

pharmacies to dispense 340B drugs to patients.[6]  Rhode Island is the most recent state to enact such legislation.  On June 27, 2025, Governor Daniel McKee signed the Defending Affordable Prescriptions Drug Costs Act into law.  2025 R.I. Pub. Laws ch. 288 (to be codified at R.I. Gen Laws §§ 5-19.3-1 through 5-19.3-9).  Like legislation enacted in other states, Chapter 288 provides that a manufacturer "shall not . . . [i]nterfere with, or limit, a 340B covered entity's choice to use a contract pharmacy for drug distribution or dispensing." *Id.* § 5-19.3-3(a)(7). Section 5-19.3-5(a) further states that:

> A pharmaceutical manufacturer, agent, or affiliate of such manufacturer shall not deny, restrict, prohibit, or otherwise interfere with, either directly or indirectly, the acquisition of a 340B drug by, or delivery of a 340B drug to, a pharmacy that is under contract with a 340B covered entity and is authorized under such contract to receive and dispense 340B drugs on behalf of the covered entity unless such receipt is prohibited by the United States department of health and human services.

Chapter 288 also prohibits manufacturers or their agents and affiliates from "impos[ing] additional terms or limitations not required by federal law as a condition of 340B participation." *Id.* § 5-19.3-5(c). Among other things, a manufacturer may not "require the submission of claims-level data or documentation that identifies 340B drugs as a condition of reimbursement or pricing, unless it is required by the Centers for Medicare and Medicaid Services." *Id.* § 5-19.3.-3(a)(5). To comply with the new law, covered entities must separately submit annual reports to state officials, including the Auditor General, detailing the "covered entity's participation in the program during the previous calendar year." *Id.* § 5-19.3.-6.

The Auditor General may "[i]nvestigate complaints and take appropriate actions to ensure compliance" with Chapter 288, as well as promulgate any necessary rules and regulations. *Id.* § 5-

---

[6] *See e.g.,* Ark. Code Ann. § 23-92-604(c) (2021); S.B. 28, 2023-2024 Leg., Reg. Sess. (Kan. 2024); La. Rev. Stat. Ann. §§ 40:2884-2885 (2023); Md. Code Ann. § 12-6C-09.1 (2024); 24-A Me. Rev. Stat. ch. 103 (2025); Minn. Stat. Ann. § 62J.96 (2024); Miss. Code Ann. § 41-149-7 (2024); Mo. Ann. Stat. § 376.414 (2024); W. Va. Code § 60A-8-6a(b)(1) (2024).

19.3.-7. Violations of Chapter 288 constitute "unfair sales practices" under Rhode Island's Deceptive Trade Practices Act ("DTPA"), R.I. Gen. Laws § 6-13.1. The new law, which is scheduled to take effect on October 1, 2025, further specifies that "[n]othing in this chapter is to be construed or applied to be less restrictive than federal law for a person or entity regulated by this chapter," and "[n]othing in this chapter is to be construed or applied to be in conflict with . . . [a]pplicable federal law and related regulations." *Id.* §§ 5-19.3-9(a), (b).

Chapter 288 is part of a broader spate of bills that shore up Rhode Island's health care system by reducing administrative burdens associated with prior authorization, increasing Medicaid reimbursement for primary care and for the state's safety net facilities, and expanding the state's primary care workforce. *See* J. Williams, *Four changes coming to health care in Rhode Island from the General Assembly*, Prov. J. (June 24, 2025), https://www.providencejournal.com/story/news/healthcare/2025/06/24/changes-to-health-care-in-rhode-island-from-the-general-assembly/84323451007/. During floor debate on the legislation and in committee, testimony by members of the Rhode Island House and Senate as well as community stakeholders focused on the importance of allowing 340B covered entities the freedom to contract with contract pharmacies of their choice to conveniently deliver drugs to patients:

> We used to have a broad network of pharmacies, from Walgreens, Stop & Shop, and CVS. Through these [manufacturer-imposed contract pharmacy] restrictions, we have to select one pharmacy . . . . [T]he patients in our discount pharmacy prescription program can only go to one of those pharmacies. So, we had to pick one that was 'centralized.' Well, if you think where is there a central pharmacy between Burrillville and North Kingstown and Scituate and Foster, we ended up going to the pharmacy in Chepachet. Our patients from North Kingstown are not driving to Chepachet to get their $5 prescription, so that's one of the impacts.

Testimony of Peter Bancroft, CEO, WellOne Primary Medical and Dental Care, Regarding House Bill 5634, Before the House Committee on Health and Human Services (April 10, 2025), available at https://capitoltvri.cablecast.tv/show/11123?seekto=6911&site=1.

These restrictions have not only limited our ability to expand federal dollars, which was the intent [of the 340B statute], we have had to cut positions and lay off staff. . . . [We have] 85,000 patients in Providence. We take care of about half of the city. 70% of those are Medicaid.

Testimony of Merrill Thomas, President/CEO, Providence Community Health Centers, Regarding House Bill 5634, Before the House Committee on Health and Human Services (April 10, 2025), available at https://capitoltvri.cablecast.tv/show/11123?seekto=6911&site=1.

[I]t is the 340B program and the savings therefrom that allow [Landmark Medical Center in Woonsocket, RI] to not only continue providing that uncompensated care but to provide neonatal services, to provide psychiatric services – services that would otherwise be unavailable.

Floor Testimony of Rep. Jon Brien, 2025-H 5634 Sub A (June 18, 2025), available at https://capitoltvri.cablecast.tv/show/11464?seekto=3004&site=1.

The legislative record is replete with other examples of how pharmaceutical manufacturers' efforts to unilaterally restrict the use of contract pharmacies for drug delivery have detrimentally impacted covered entities providing medical services to some of Rhode Island's most vulnerable residents.[7] *See, e.g.*, Senate Health and Human Services Subcommittee, S0114, Agenda Date: March 20, 2025, https://www.rilegislature.gov/senators/SenateComDocs/Pages/Health%20 and%20Human%20Serv%202025.aspx. Brown University Health ("BUH"), for instance, noted that these restrictions have resulted in an "immediate $20 million loss" resulting in "direct adverse impacts to patient care." Ex. 2 at 1 (Letter from Christine Collins, SVP, Pharmacy and PeriOp Services, Brown University Health). This puts at risk the expansion of BUH's "healthy weight and

---

[7] Judicial notice is properly taken of matters of public record, including material maintained on government websites, such as, the legislative record found on the General Assembly's website. *Gent v. Mutual Ins. Soc'y*, 611 F.3d 79, 84 n.5 (1st Cir. 2010); *Laccinole v. Appriss, Inc.*, 453 F.Supp.3d 499, 502 n.2 (D.R.I. 2020); *see also Alharbi v. Beck*, 62 F. Supp. 3d 202, 209 (D. Mass. 2014) ("a legislative report is a public record properly subject to judicial notice") (citing *Stasiukevich v. Nicolls,* 168 F.2d 474, 479 (1st Cir. 1948)); Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2409 (3d ed.) (discussing judicial notice of legislative record).

nutrition programs, cardiac health, adult psychiatry, diabetes, early intervention for children and health education programs, and free naloxone for opioid overdose management." *Id.*

The Hospital Association of Rhode Island ("HARI") similarly noted that savings generated by the 340B Program enabled Rhode Island hospitals to offer "diverse programs and services directly benefiting patients, such as medication therapy management, diabetes education, behavioral health services, opioid treatment, and access to free or discounted drugs." Ex. 3 at 1 (Letter from Lisa P. Tomasso, Senior Vice President, HARI). Pharmaceutical manufacturers' restrictions on the use of contract pharmacies "undermine the program's purpose, resulting in more than $30 million in financial losses for hospitals and health centers." *Id.*

East Bay Community Action Program ("EBCAP") likewise observed that "limiting the number of pharmacies eligible to disburse prescribed medications to our patients" has had a "devastating financial impact on EBCAP, resulting in a revenue loss of more than $3 million over the last three years." Ex. 4 at 1 (Letter from Rilwan K. Feyisitan Jr. President & CEO, EBCAP). This loss of 340B savings threatens EBCAP's ability to "reinvest savings into essential clinical services, including primary care, behavioral health, and substance use treatment." *Id.*

Other community health providers have been forced to reduce staff. Providence Community Health Centers ("PCHC"), for instance, "incurred over $9 million in financial losses from the 340B program" due to restrictions imposed by pharmaceutical manufacturers. Ex. 5 at 1 (Letter from Merrill Thomas, President & CEO, PCHC). This required PCHC to "reduce staff" and scale back programs for "free medication access for our most at-risk patients, a consequence that directly affects the health and well-being of our community." Chapter 288 aims to prohibit manufacturers from arbitrarily limiting 340B savings to a single pharmacy when a covered entity's

patients need to fill prescriptions at other contract pharmacies, thereby enabling covered entities to fund needed investments in care throughout Rhode Island.

## V.    Previous Challenges to Chapter 288

As noted at the outset, this case is not the first legal challenge to Chapter 288.  In August 2025, before Chapter 288 took effect, manufacturers Novartis and AbbVie sued Rhode Island Attorney General Peter F. Neronha and Rhode Island Auditor General David Bergantino, alleging, in relevant part, that Rhode Island's Chapter 288 is preempted by Section 340B.  Both manufacturers moved for preliminary injunctions preventing the state officials from enforcing Chapter 288.  On September 30, 2025, after considering the parties' extensive briefing and hearing oral argument, this Court issued a bench decision denying the manufacturers' motions, holding that the manufacturers were "not likely to succeed on their preemption claim[s]. "  *See* Ex. 1 at 56:22-23, 57:13-14.  The Court also held that "none of the final three preliminary injunction factors, irreparable harm, balancing of the harms or public interest, favorably impact the Plaintiffs' requested injunction" and "that the public interest weighs heavily in favor of the state" such that the "final two factors [were] in Defendants' favor."  *Id.* at 58:20-23, 59:12-15.  As a result, Chapter 288 went into effect on October 1, 2025, as scheduled.  *See id.* at 55:9-10.

On October 1, 2025, PhRMA filed the instant suit against the same state officials, again asserting, in relevant part, that Chapter 288 is allegedly preempted by Section 340B under the Supremacy Clause.[8]  *See* ECF 1 at ¶¶ 132-89. According to its complaint, PhRMA is "a trade association representing the nation's leading innovative biopharmaceutical research companies,"

---

[8] PhRMA's complaint, like the one filed by Novartis, includes an additional claim under the dormant commerce clause.  PhRMA, however, does not rely on this claim in its motion for a preliminary injunction.  Instead, PhRMA relies solely on its preemption claim.  ECF No. 11 at 3-31; ECF No. 20 at 3.

ECF 1 at ¶ 23, and "represents its members across the country with regard to legislative, political, legal, and social issues in which the biopharmaceutical industry has an interest." ECF 11-2 at ¶ 5. On October 8, 2025, PhRMA moved for a preliminary injunction to enjoin the Rhode Island Attorney General and Auditor General from enforcing Chapter 288 against any of PhRMA's members, including Novartis.  *See* ECF 11.

## ARGUMENT

### I.    Standard of Review

The issuance of a preliminary injunction is "an extraordinary and drastic remedy that is never awarded as of right." *Peoples Fed. Sav. Bank v. People's United Bank*, 672 F.3d 1, 8–9 (1st Cir. 2012). "A plaintiff seeking a preliminary injunction must establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Together Emps. v. Mass Gen. Brigham Inc.*, 32 F.4th 82, 85 (1st Cir. 2022) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). The last two factors "merge when, as here, the Government is the opposing party." *Rhode Island Coalition Against Domestic Violence v. Bondi*, No. 25-279, 2025 WL 2271867, *10 (D.R.I. Aug. 8, 2025) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)). Likelihood of success "weighs most heavily in the preliminary injunction calculus." *Ryan v. U.S. Immigration & Customs Enforcement,* 974 F.3d 9, 18 (1st Cir. 2020). "If the movant 'cannot demonstrate that [it] is likely to succeed in [its] quest, the remaining factors become matters of idle curiosity.'" *Id.* (quoting *New Comm Wireless Servs., Inc. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002)). And PhRMA's burden of showing a reasonable likelihood of success on the merits is heightened because it mounts a facial challenge to Chapter 288: "A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." *PhRMA v.*

*Concannon*, 249 F.3d 66, 77 (1st Cir. 2001) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)).

## II.    PhRMA Fails to Establish a Likelihood of Success on the Merits

PhRMA's request for a preliminary injunction enjoining the state officials from enforcing Chapter 288 should be denied because, as this Court already determined in the related cases, PhRMA fails to demonstrate any likelihood of success on the merits of its federal preemption claim. "Preemption analysis begins with the presumption that 'Congress did not intend to displace state law.' *Maryland v. Louisiana*, 451 U.S. 725, 746 (1981). "This assumption provides assurance that the 'federal-state balance,' *United States v. Bass*, 404 U.S. 336, 349 (1971), will not be disturbed unintentionally by Congress or unnecessarily by the courts." *Gade v. National Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 100 (1992). PhRMA's attempts to bypass the presumption against preemption by invoking Congress's spending powers and fabricating a conflict between state and federal law where none exists fail to demonstrate any likelihood of success. *See id.* ("The 'teaching of this Court's decisions ... enjoin[s] seeking out conflicts between state and federal regulation where none clearly exists.'" (quoting *Huron Portland Cement Co. v. Detroit,* 362 U.S. 440, 446 (1960)).

### A.  Laws Passed Pursuant to Congress' Spending Powers do not Automatically Preempt State Laws

Laws passed pursuant to Congress' spending powers do not automatically preempt all state regulations. None of the cases on which PhRMA relies supports such a sweeping and novel proposition that would be antithetical to the historic "federal-state balance." *Bass*, 404 U.S. at 349; ECF 11-1 at 3-4 and 14-17. Instead, most of the cases PhRMA cites involved questions relating to state law intrusions into "uniquely federal" interests, such as, foreign relations, immigration, federal government contracts, and fraud on federal agencies. *See, e.g., Buckman Co. v. Plaintiffs'*

*Legal Committee*, 531 U.S. 341, 347-48, 352 (2001) (state tort claim for fraud against FDA conflicted with "uniquely federal" interest where there was "clear evidence" that Congress intended such "fraud-on-the-agency" claims to be "enforced exclusively by the Federal Government); *Boyle v. United Tech. Corp*., 487 U.S. 500, 507-09 (1988) (state tort law conflicted with "uniquely federal interests" related to obligations and rights under federal government contracts); *National Foreign Trade Council v. Natsios*, 181 F.3d 38, 49-50, 74-76 (1st Cir. 1999) (state law restricting trade with a foreign country preempted by the federal government's "long understood" and "exclusive" power to conduct foreign affairs), *aff'd sub nom, Crosby v. National Foreign Trade Council*, 563 U.S. 363 (2000). In each case, the courts contrasted situations involving "uniquely federal" interests from "situations implicating 'federalism concerns and the historic primacy of state regulation of matters of health and safety.'" *Buckman*, 531 U.S. at 348 (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996)); *Boyle,* 487 U.S. at 504 ("In most fields of activity [excluding those involving 'uniquely federal interests'], this Court has refused to find federal pre-emption of state law in the absence of either a clear statutory prescription . . . or a direct conflict between federal and state law.") (cleaned up). Where a state exercises its traditional authority over local matters of public health and safety, as opposed to intruding into areas of uniquely federal interests, the presumption against preemption fully applies. *See Buckman*, 531 U.S. at 348 (presumption against preemption applies where state regulates on matters of health and safety in contrast to matters of uniquely federal interest); *Natsios*, 181 F.3d at 73 ("in an area traditionally occupied by the states, congressional intent to preempt must be 'clear and manifest'" in contrast to "areas traditionally reserved to the federal government, and in particular where state laws touch on foreign affairs.").

The Third Circuit's decision in *CoreCivic, Inc. v. Governor of N.J.,* 145 F.4th 315 (3d Cir. 2025), is to the same effect. *See* ECF 11-1 at 16. There, the state passed a law that precluded state agencies and private parties from contracting to detain individuals for civil immigration violations. *Id.* at 319.  The state law did not directly mention the federal government, the Third Circuit reasoned that the state's true intent was to forbid the federal government from entering into "new contracts for civil immigration detention." *Id.* at 319-20, 322. This sort of state regulation "severely undercut" the federal government's "core power to enforce immigration laws," including through the use of detention for civil immigration violations. *Id.* at 319, 323. In striking down the state law, the Third Circuit explained, "[o]nly the federal government has the power to decide whether, how, and why to hold aliens for violating immigration law.  It alone has the power to make these contracts in the first place." *Id.* at 325. Nothing remotely similar is at issue here given the state's historic use of police powers to regulate in areas of public health and safety. *Infra* at 22.

By contrast, in *In re Pharmaceutical Industry Average Wholesale Price Litigation*, 582 F.3d 156 (1st Cir. 2009), the First Circuit rejected drug manufacturer AstraZeneca's argument that, under *Buckman*, the "plaintiffs' state law claims fail[ed] because they conflict with the Medicare statute, which empowers [the federal government] with broad authority to investigate and punish Medicare fraud." 582 F.3d at 176. The First Circuit acknowledged that "the deceptive practices at issue in [the] case depended on the structure of the Medicare program," such that "the deception touched on a federal agency," but distinguished *Buckman* because "policing deceptive conduct is nonetheless a traditional area of state concern" and the case at hand involved "a state law remedy for deceptive practices by a [drug] manufacturer against its customers." *Id.* at 176-77; *see id.* at 177 n.14 (noting that "the regulation of medicine and its associated costs" is another traditional area of state concern).

*South Carolina v. Baker*, 485 U.S. 505 (1985), another inapposite case on which PhRMA relies, gets them no further. ECF 11-1 at 15. *Baker* involved application of the intragovernmental tax immunity doctrine. *Baker*, 485 U.S. at 523. Under that doctrine, the Court held that a state could not impose a tax on the federal government or "on an agency or instrumentality so closely connected to the Government that the two cannot realistically be viewed as separate entities." *Id.* Again, nothing remotely similar is at play here. Chapter 288 is not state tax and does not attempt to directly regulate the federal government or its operations in any way.

Nor are manufacturers that elect to participate in the 340B Program "so closely connected to the Government" that they cannot realistically be viewed as separate entities. Manufacturers participate in the 340B Program primarily to gain continued access to lucrative Medicaid and Medicare Part B reimbursements. *Supra* at 3. The PPAs manufacturers use to opt into the 340B program "are not transactional, bargained-for contracts" but "uniform agreements that recite the responsibilities § 340B imposes, ... simply incorporate statutory obligations and record the manufacturers' agreement to abide by them[,]" and thus "serve as the means by which drug manufacturers opt into the statutory scheme." *Astra USA, Inc. v. Santa Clara Cnty.*, 563 U.S. 110, 113, 118 (2011). PhRMA cannot seriously assert that PPAs nevertheless transform "for profit" drug manufacturers into federal "contractors" that "have been so incorporated into the government structure as to become instrumentalities of the United States and thus enjoy governmental immunity." *United States v. New Mexico*, 455 U.S. 720, 736 (1982) (quoting *United States v. Boyd*, 378 U.S. 39, 48 (1964)). That sort of "manipulation and wooden formalism" has "no proper place in determining the allocation of power between coexisting sovereignties." *Id.* at 737.

For many of the same reasons, PhRMA's reliance on *Osborn* v. *Bank of U.S.*, 22 U.S. (9 Wheat.) 738 (1924), is also misplaced. *See* ECF 11-1 at 16. There, the "state tax held

unconstitutional was a tax upon the existence of the bank—upon its right to transact business within the State of Ohio. It was, as it was intended to be, a direct impediment in the way of those acts which Congress, for National purposes, had authorized the bank to perform." *Union Pac. R. Co. v. Peniston*, 85 U.S. 5, 35 (1873). For this reason, the power of the state to tax the bank was denied because the tax was a "direct impediment in the way of a governmental operation performed through the bank as an agent." *Id.; see also Crandall v. Nevada*, 73 U.S. (6 Wall.) 35, 44-45 (1867) (states may not "impede or embarrass the constitutional operations of [the federal] government"). Once again, there can be no credible argument that PhRMA and its members operate as agents of the government. Manufacturers are not required to participate in the 340B Program at all; they voluntarily elect to participate in exchange for continued access to Medicaid and Medicare Part B reimbursements.

United States v. Washington*, 596 U.S. 832 (2022) is likewise inapposite. *See* ECF 11-1 at 16. The state law in that case directly discriminated against the federal government by targeting federal workers at one federal facility for different treatment under the state's workers' compensation law. 596 U.S. at 835. The net effect of the law was to increase the federal government's costs for workers' compensation benefits by making it easier for federal workers to claim benefits than non-federal workers. *Id.* at 836. Chapter 288 imposes no comparable discriminatory burden directly on the federal government or its workforce, let alone one sufficient to displace Rhode Island's traditional authority over matters of public safety and health.

Furthermore, unlike all of the cases on which PhRMA relies, Chapter 288 does not impermissibly "target" or "directly regulate" the 340B program. *See* ECF No. 11-1 at 15-16. Merely that Chapter 288 references the 340B Program and defines its terms with reference to federal definitions does not compel preemption. As the Fifth Circuit recently held in rejecting the

same argument:  the "Supremacy Clause's text does not indicate that states cannot regulate by reference to pre-existing federal programs. . . [t]his language indicates federal law governs despite a conflict with state law, but not that states lack the power to enact regulations by reference to federal law." *AbbVie v. Fitch,* 2024 WL 3503965, at *9; *see also Frey,* 2025 WL 2813787, *10 (there is no "categorical rule that requires a finding of preemption whenever a state law is addressed directly to those participating in a federal program where the federal statute does not rely on the state to implement the program"); *Weiser,* No. 25-cv-1847-WJM-KAS, at 14 (rejecting "broad contention" that "there is necessarily a field preemption issue where a 'state law explicitly depends on a federal statute'"). It is entirely permissible—and reasonable—for a state law to define its reach by reference to federal law (and then imposing its own separate and nonconflicting requirements), including when the "regulatory object" of the state law is a business relationship between private entities (here, drug manufacturers and covered entities) that is also regulated by a federal program. *See Chamber of Com. of U.S. v. Whiting*, 563 U.S. 582, 607–08 (2011) (rejecting preemption challenge to a state statute under which employers had to check their employees' federal immigration status using a specified federal database)*; Hillsborough Cnty. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 717-19 (1985) ("Undoubtedly, every subject that merits congressional legislation is, by definition, a subject of national concern. That cannot mean, however, that every federal statute ousts all related state law."). Like Chapter 288, the state law at issue in *Whiting* expressly defined its reach by reference to federal law and adopted the federal definition of "unauthorized alien" for purposes of state law. *Id.* at 1981.  That challenged state law was no more "targeted" or focused on the federal law than Chapter 288, which likewise defines its reach by reference to the 340B Program's operative terms.

Furthermore, even if the 340B Program were a matter of uniquely federal interest, preemption is not automatic, regardless of whether the program was enacted under Congress' spending power. The "key question" remains whether the "state regulation sufficiently interferes with federal regulation that it should be deemed pre-empted." *Gade,* 505 U.S. at 107. PhRMA's attempt to conflate the standard applicable to Spending Clause legislation into the standard required for preemption under the Supremacy Clause fails for the simple reason that the 340B Program creates no contract between the state and federal government. *See Barnes v. Gorman*, 536 U.S. 181 (2002) (characterizing "Spending Clause legislation as 'much in the nature of a contract: in return for federal funds, the [recipients] agree to comply with federally imposed conditions'") (quoting *Pennhurst State School and Hospital v. Halderman,* 451 U.S. 1, 17 (1981)). Under the 340B Program, the only "contract" is the PPA between the federal government and manufacturers, and "'PPAs are not transactional, bargained-for contracts' but are instead 'uniform agreements that recite the responsibilities § 340B imposes." *Johnson & Johnson Health Care Sys. Inc. v. Kennedy,* No. CV 24-3188, 2025 WL 1783901, at *9 (D.D.C. June 27, 2025) (quoting *Astra USA, Inc.*, 563 U.S. at 113), *appeal filed*, (D.C. Cir. Jun. 30, 2025). Rhode Island is not a party to these PPAs and certainly did not agree to surrender its traditional control over the regulation of pharmacies or delivery of drugs to patients of health care providers operating within its territory. *See Moyle v. United States*, 603 U.S. 324, 347 (2024) ("conditions attached to the receipt of federal funds must be unambiguous"); *O'Brien v. Mass. Bay Transp. Auth.*, 162 F.3d 40, 43 (1st Cir. 1998) (noting that "preemptive legislation enacted under the spending power presents states with a choice").

Contrary to PhRMA's assertion, Chapter 288 also does not change anything relating to the 340B Program. *See Whiting*, 563 U.S. at 605. The 340B Program as enacted by Congress continues to "operate[] unimpeded by the state law." *Id.* Even the cases on which PhRMA relies

(ECF 11-1 at 16) recognize that courts should be hesitant to infer a conflict between federal and state laws where the federal law is silent on the issue addressed by state law. *See Oklahoma Tax Comm'n v. Texas Co.,* 336 U.S. 342, 362 (1949) ("we refuse to infer from mere congressional silence approval of the doctrine of immunity" from state taxes levied on non-Indian lessees of allotted or restricted Native American land). As shown in the following sections, Chapter 288 merely fills in the gap left by Congress's silence regarding where drugs may be delivered or distributed to patients of 340B covered entities operating in Rhode Island. And it adds additional reporting requirements for Rhode Island covered entities to enhance transparency and accountability relating to the use of 340B Program savings—another area that does not conflict or interfere with the federal program's operation.

### B.  PhRMA Fails to Overcome the Presumption Against Preemption as Chapter 288 is a Lawful Exercise of the State's Historic Police Powers

"[I]n all pre-emption cases, and particularly in those in which Congress has legislated in a field which the States have traditionally occupied, [courts] start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *In re Pharm. Indus. Average Wholesale Price Litig.*, 582 F.3d at 173 (quoting *Wyeth v. Levine*, 555 U.S. 555, 565 (2009)). That presumption against preemption applies with full force in this case because regulations of "matters related to health and safety," including the "practice of pharmacy" and consumer protection relating to the regulation of medicine, are areas traditionally left to state regulation. *Fitch*, 152 F.4th 646 (holding that a comparable state law reflected "no dominant federal interest" but instead addressed "traditional general areas of state regulation and police power:  public health and consumer protection"); *McClain*, 95 F. 4th at 1144 ("Pharmacy has traditionally been regulated at the state level, and we must assume that absent a strong showing that Congress intended preemption, state statutes that

impact health and welfare are not preempted.") (quoting *Pharm. Care Mgmt. Ass'n v. Wehbi*, 18 F. 4th 956, 972 (8th Cir. 2021)); *Medtronic, Inc.*, 518 U.S. at 485 (recognizing "the historic primacy of state regulation of matters of health and safety"); *Wyeth*, 555 U.S at 578-79 ("In keeping with Congress' decision not to pre-empt common-law tort suits, it appears that the FDA traditionally regarded state law as a complementary form of drug regulation ... [and] long maintained that state law offers an additional, and important, layer of consumer protection that complements FDA regulation."); *Weiser*, No. 25-cv-1847-WJM-KAS, at 16 (applying presumption against preemption to comparable state "public health" regulation). "A state's passage and enforcement of laws that prohibit discrimination is [also] an exercise of a state's historic police powers." *Figueroa v. Foster*, 864 F.3d 222, 232 (2d Cir. 2017); *see Kroske v. U.S. Bank Corp.*, 432 F.3d 976, 981 (9th Cir. 2005), *as amended* (Feb. 13, 2006) ("[A]lthough we recognize that there is a significant federal presence in the regulation of national banks, ... [the state law] was enacted pursuant to the State's historic police powers to prohibit discrimination on specified grounds. ... Thus, we begin with the presumption that Congress did not intend the National Bank Act to preempt the [state law].")

PhRMA has the burden of overcoming the presumption against preemption. *See Capron v. Attorney Gen.*, 944 F.3d 9, 21 (1st Cir. 2019). Here, Section 340B contains no explicit clause preempting state law, so PhRMA must show either: (1) field preemption, where federal legislation pervasively occupies a regulatory field, or (2) conflict preemption, where a federal statute conflict with state law. *Arizona v. United States*, 567 U.S. 387, 399-400 (2012). As this Court determined in the related cases and as multiple other courts also have determined, PhRMA fails to demonstrate a likelihood of success under either theory. *See* Ex. 1 at 56:6-9, 22-23.

23

### C.  Section 340B does not Preempt Chapter 288 under Field Preemption

PhRMA's field preemption argument fails because it cannot show that Congress enacted such comprehensive legislation through Section 340B that it has fully "occupied" the relevant field to the exclusion of Rhode Island's traditional police powers. *Arizona,* 567 U.S. at 401. Congress' intent to completely displace state law through field preemption can only be inferred from its enactment of a federal regulatory scheme "'so pervasive . . . that [it] left no room for the States to supplement it' or where there is a 'federal interest so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.'" *Id.* at 399 (quoting *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230 (1947)). The presumption against allowing the "strong medicine" of federal preemption displacing the "historic police powers of the States" holds "especially true when the federal statute creates a program, such as Medicaid, that utilizes 'cooperative federalism': 'Where coordinated state and federal efforts exist within a complementary administrative framework, and in the pursuit of common purposes, the case for federal preemption becomes a less persuasive one.'" *Concannon*, 249 F.3d at 75 (citations omitted).

The 340B Program is not "so pervasive . . . that Congress left no room for the States to supplement it[.]" *McClain*, 95 F.4th at 1143 (quoting *Sanofi,* 58 F.4th at 703) (other quotation marks and citation omitted); *Fitch*, 152 F.4th at 645 (same); *Frey*, 2025 WL 2813787. *7 ("the 340B statute cannot reasonably be characterized as comprehensive or pervasive").  "Notably, it regulates neither the distribution of drugs to patients nor the role of pharmacies in this distribution." *Fitch*, 152 F.4th at 646; *Weiser,* No. 25-cv-1847-WJM-KAS, at 13-14 (same). In fact, Section 340B is "silent about delivery conditions," as well as covered entities' ability to contract with outside pharmacies for the distribution of 340B drugs. *Johnson*, 102 F.4th at 460.  HRSA's 1996 Guidance

confirms that, "[d]uring the early months following [Section 340B's] enactment, it became clear that there were many gaps in the legislation." August 1996 Guidance at 43,549; *see* H.R. Rep. No. 102–384(II), at 16 (1992) ("The Committee bill does not specify whether 'covered entities' would receive these favorable prices through a point-of-purchase discount, through a manufacturer rebate, or through some other mechanism."). "[B]ecause 340B does not dictate many of the terms regarding manufacturers' obligation to offer and provide the drugs, the language of 340B is insufficient to imply a congressional intent to preclude all state regulation in the field." *Frey*, 2025 WL 2813787, *8.

Congress's silence with respect to the delivery and distribution of 340B drugs cannot be interpreted as an implied ban on any additional state regulation: "Mere silence, in this context, cannot suffice to establish a 'clear and manifest purpose' to pre-empt local authority." *Wisconsin Pub. Intervenor v. Mortier,* 501 U.S. 597, 607 (1991) (citing *Rice,* 331 U.S. at 230). To the contrary, given the strong presumption against preemption in the areas of pharmacy and public health, Congress's silence regarding how covered entities or manufacturers must deliver discounted drugs to patients of covered entities means that Section 340B contemplates concurrent state regulation—as multiple federal courts have recently held. *E.g., Fitch,* 152 F.4th at 646 ("'matters left unaddressed'" by Section 340B "'are presumably left subject to the disposition provided by state law'") (quoting *O'Melveny & Myers v. FDIC*, 512 U.S. 79, 85 (1994)); *Frey*, 2025 WL 2813787, *8 (holding that a comparable state law regulating the distribution of drugs to 340B Program patients through contract pharmacies is "a subject that does *not* fall within a specific field that Congress manifested an intent [to] occupy exclusively") (emphasis added). As the District of Maine recently held, "the limited specified requirements of the 340B program and Congress's silence on all other aspects of the transactions necessary to accomplish the objectives of 340B do

not imply that Congress intended to confer on manufacturers a right to be free from all state law requirements regarding drug distribution to patients," including through the use of contract pharmacies. *Frey*, 2025 WL 2813787, at *12.

In *McClain*, the Eighth Circuit reached the same conclusion, holding that "the 340B Program is not so pervasive that Congress left no room for the States to supplement it" and that "Congress's decision not to legislate the issue of pharmacy distribution indicates that Section 340B is not intended to preempt the field." *McClain,* 95 F.4th at 1143. Similarly, in rejecting PhRMA's attempt to enjoin enforcement of Mississippi's comparable law, the Southern District of Mississippi held that the congressional silence identified in *Sanofi* and *Johnson* "does not *implicitly mandate* that manufacturers deliver to any contract pharmacy [but] does not, on the other hand, show that Congress clearly intended to *preclude states* from enacting their own public health regulations aimed at maximizing the availability of low-cost drugs for covered-entity patients." *AbbVie v. Fitch*, 2024 WL 3503965, at *10; *Novartis v. Fitch,* 738 F. Supp. 3d at 742, 748, 751 (same).

Rather than addressing these cases and their reasoning, PhRMA argues instead that field preemption is compelled by the Supreme Court's holding in *Astra*. That argument is unavailing; in *Astra*, the Supreme Court held that covered entities cannot bring overcharging claims as third party beneficiaries to the price agreements signed by manufacturers and the federal government under section 340B. *Astra USA, Inc.*, 563 U.S. at 117-19. The Supreme Court's rejection of a right of action, under federal law, for covered entities to enforce federal pricing agreements has little bearing on whether section 340B preempts States from enacting their own laws of the delivery of 340B drugs. Covered entities are not States—which, as sovereign entities, retain broad authority to regulate matters under their traditional police powers.  *See Hillsborough Cnty.*, 471 U.S. at 717

26

("merely because [a federal program was] sufficiently comprehensive to meet the need identified by Congress [does] not mean that States are barred from identifying additional needs or imposing further requirements in the field"); *see also Allen v. FamilyCare, Inc.*, 812 F. App'x 413, 418 (9th Cir. 2020), as amended (May 7, 2020) ("[T]hat the Medicaid Act had no private enforcement mechanism says nothing about a Congressional intent to preclude a state from imposing its own sanctions for violating federal requirements."). Because *Astra* did not involve a state regulating under its traditional police powers, the Supreme Court did not apply the presumption against preemption that is applicable here or even address preemption at all—as multiple federal courts have since recognized. *See Novartis v. Fitch*, 738 F. Supp. 3d at 752 ("The Supreme Court's rejection of a right of action for covered entities under [federal pricing agreements] has minimal bearing on whether Section 340B preempts state law about the delivery of 340B drugs. And *Astra* did not apply any presumption in favor of such a right of action analogous to the presumption against preemption applicable here.").

The remainder of PhRMA's arguments in support of its field preemption theory are premised on the mistaken assumption that Chapter 288 allegedly adds new terms and conditions to the 340B Program. ECF 11-1 at 20-21. Chapter 288 does no such thing. As already shown, while federal law regulates the determination of *prices* on Section 340B drugs and provides robust enforcement mechanisms that ensure covered entities and manufacturers comply with those requirements, Congress has not precluded Rhode Island or any other state from enacting its own policy governing *delivery* of Section 340B drugs, or the other terms and conditions on which covered entities may contract with pharmacies. *See Skrmetti*, 2025 WL 18095271, at *12-13 (collecting cases rejecting argument that state regulation of delivery of drugs was preempted because Section 340B is "silent about delivery"). Accordingly, PhRMA's assertion that Congress's

decision to set the price of 340B "offers" implicitly indicates a decision to exempt all other "terms" of manufacturers' 340B offers from future state regulation fails. *Frey*, 2025 WL 2813787, at *12 (rejecting any such implication in light of the 340B Program's "limited specified requirements" and "Congress's silence" on matters including delivery); *Weiser,* No. 25-cv-1847-WJM-KAS, at 12 ("it cannot be that Congress has enacted a scheme that governs 'every detail' of the 340B Program").

Nor does Chapter 288 "compel[] manufacturers to sell drugs at 340B prices when federal law does not." ECF 11-1 at 20. Chapter 288 does not expand the list of covered entities eligible to purchase drugs at 340B prices, nor which patients count as 340B eligible patients, beyond those defined by federal law; to the contrary, it adopts the federal definition. R.I. Gen. L. § 5-19.3-2(3). Nor, as already seen, does Chapter 288 say anything at all about the price at which manufacturers participating in the program must sell the drugs. Pricing is determined exclusively by federal law. PhRMA's real complaint is that, by prohibiting manufacturers from restricting delivery of 340B drugs through only an in-house pharmacy or one contract pharmacy, Chapter 288 makes it easier for patients of covered entities to pick up their medications and, consequently, for covered entities in Rhode Island to recoup 340B Program savings. Tellingly, Congress placed no "cap" on the number of drugs eligible for 340B Program pricing discounts. As one court recently held:

> The Court discerns nothing in 340B to suggest that Congress intended to limit the number of patients for whom covered entities may prescribe drugs at the discounted rate. For instance, there is no persuasive evidence to suggest that Congress intended to limit the number of legitimate discounted claims to a subset of the covered entities' eligible patients that corresponds to patients living in the immediate vicinity of a single in-house pharmacy or designated contract pharmacy.

*Frey*, 2025 WL 2813787, *11. The only limitations imposed on eligibility for 340B Program pricing is that the drugs must be prescribed by a covered entity for use by one of the covered

entity's patients. Chapter 288 does nothing to change this and, as shown in the following section, does not conflict with any of the 340B Program's substantive provisions.[9]

### D. Section 340B does not Preempt Chapter 288 under Conflict Preemption

PhRMA fares no better with its conflict preemption challenge to Chapter 288. Conflict preemption only arises "where 'compliance with both state and federal law is impossible,' or where 'the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Oneok, Inc. v. Learjet, Inc.,* 575 U.S. 373, 377 (2015) (quoting *California v. ARC Am.Corp.,* 490 U.S. 93, 100-01 (1989)). However, "[t]he presumption against federal pre-emption of a state statute designed to foster public health ... has special force when it appears, and the [federal government] has not decided to the contrary, that the two governments are pursuing 'common purposes[.]'" *Walsh*, 538 U.S. at 666 (citations omitted). Because PhRMA has not argued that compliance with both state and federal law is impossible, its arguments "concern only obstacle preemption." *Capron*, 944 F.3d at 26.

Divining the objectives underlying federal law is an inherently "contextual" inquiry. *Grant's Dairy*, 232 F.3d at 15 (citing *Hines v. Davidowitz*, 312 U.S. 52, 68 (1941)). Context here shows that the "purpose of the 340B program was to provide a means to make 340B entities

---

[9] PhRMA contends that the General Assembly's use of the word "acquisition" in § 5-19.3-5(a) shows that Chapter 288 is not limited to delivery because there could be no delivery of 340B drugs without a sale at discount pricing. ECF 11-1 at 20-21. This is pure sophistry. Chapter 288 prohibits manufacturers from restricting or interfering with a 340B drug's delivery to or acquisition by a "pharmacy that is under contract with a 340B covered entity" in Rhode Island. This prohibition does not change the price at which drugs subject to the 340B Program are sold but only where or how they are distributed to patients. As HRSA recognized, the use of more than one contract pharmacy enables patients of covered entities to pick up their medications at more convenient locations. *See* HRSA, Notice Regarding 340B Drug Pricing Program-Contract Pharmacy Services, 75 Fed. Reg. 10,273 (March 5, 2010) ("[i]t would be a significant benefit to patients to allow the use of more easily accessible, multiple contract pharmacy arrangements by covered entities").

profitable in order for those 340B entities to 'stretch scarce Federal resources as far as possible[,]'" thereby "reaching more eligible patients and providing more comprehensive services." *Genesis Health Care, Inc. v. Becerra*, 701 F. Supp. 3d 312, 316 (D.S.C. 2023) (quoting H.R. Rep. No. 102-384(II) (1992) at 12). Indeed, "Congress enacted Section 340B in response to pharmaceutical manufacturers increasing prices of drugs to make up for lost revenue after Congress ... created the Medicaid Drug Rebate Program[,]" with the "goal" of "protect[ing] covered entities from such price increases because they 'reduced the level of services and the number of individuals that these hospitals and clinics" could serve. *AbbVie Inc. v. Fitch*, 2024 WL 3503965, at *2 (quoting H.R. Rep. No. 102-384(II) (1992) at 12); *see* H.R. Rep. No. 102-384(II) (1992) at 11 ("In the view of the Committee, the Federal government simply cannot continue to allow the [Department of Veterans Affairs], Federally-funded clinics, and their patients to remain unprotected against manufacturer price increases.").

Context also confirms that most covered entities that 340B was intended to aid must rely upon contract pharmacies to deliver pharmacy services to their patients. *See, e.g.*, *AbbVie v. Fitch*, 2024 WL 3503965 at *19 ("[W]hen Congress enacted Section 340B, ... the potential for contract pharmacy dispensation was foreseeable."); *id.* at *14 ("[P]harmaceuticals distribution often relies on [drugs]' fungibility to facilitate efficiency. So, Section 340B presumably contemplates that efficient distribution of fungible drugs to covered-entity patients might utilize a replenishment model."). As a result, and as HRSA explicitly recognized in 1996, "[i]t would defeat the purpose of the 340B program if [the] covered entities could not use their affiliated pharmacies in order to participate in the 340B program." 1996 Guidance, 61 Fed. Reg. at 43,550. And because many covered entities' "patients currently face transportation barriers or other obstacles that limit their ability to fill their prescriptions[,]" the "use of more easily accessible, multiple contract pharmacy

arrangements by covered entities ... permit[s] covered entities to more effectively utilize the 340B program and create wider patient access by having more inclusive arrangements in their communities[.]" 2010 Guidance, 75 Fed. Reg. at 10,273.

As a result, and as the Eighth Circuit held in *McClain,* state laws regulating "the delivery of a covered entity's 340B drugs to contract pharmacies for dispensing creates no obstacle" to manufacturers' ability to comply with 340B, and are "simply deterring pharmaceutical manufacturers from interfering with a covered entity's contract pharmacy arrangements." 95 F.4th at 1145. Laws like Chapter 288 "d[o] not require manufacturers to provide 340B pricing discounts to contract pharmacies[,]" "d[o] not set or enforce discount pricing[,]" and their "penalties are aimed at activity that falls outside the purview of 340B" *Id.* In fact, laws like Chapter 288 "assist[] in fulfilling the purpose of 340B," by facilitating the distribution and dispensation of discounted 340B drugs and protected covered entities' ability to meaningfully participate in the 340B Program. *Id.*

Against that backdrop, PhRMA's various conflict preemption arguments fall short.[10] *See Whiting*, 563 U.S. at 607 ("Our precedents 'establish that a high threshold must be met if a state

---

[10] PhRMA's conflict preemption arguments challenge separate substantive portions of Chapter 288; as such, in the event that this Court agrees with PhRMA that any particular provision is preempted or otherwise unconstitutional (and that the other prerequisites for injunctive relief have been met), any injunction should be solely limited to the provision of Chapter 288 at issue. Severability "is a matter of state law[,]" and under Rhode Island law, "a court may sever an unconstitutional provision when it is not indispensable to the rest of the statute and can be severed without destroying legislative purpose and intent." *American Trucking Ass'n, Inc. v. Rhode Island Tpk. & Bridge Auth.*, 123 F.4th 27, 51 (1st Cir. 2024) (citations and quotation marks omitted). Here, that test is clearly met, as the various substantive prohibitions PhRMA challenges represent distinct means by which the General Assembly hoped to advance the critical goal of protecting Rhode Island's covered entities, and PhRMA cannot show that the General Assembly "would have forgone" Chapter 288 "altogether" if any single provision were removed. *Id.* at 52; *see also Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 382-83 (1992) (vacating multiple portions of an overbroad injunction against future enforcement of state laws).

law is to be preempted for conflicting with the purposes of a federal Act.' ... That threshold is not

met here.") (citation omitted).

### 1. *"Expands Federal 340B Obligations"*

First, PhRMA argues that Chapter 288 "conflicts with 340B's offer-and-acceptance

mechanism and unlawfully expands the scope of the federal subsidy by requiring additional 340B-

priced transactions." ECF 11-1 at 22. But whatever merit the offer-and-acceptance mechanism may

have, multiple courts already have determined that the 340B Program has many gaps. The 340B

statute is entirely silent about the sort of delivery conditions Chapter 288 addresses, including

specifically a covered entity's ability to contract with outside pharmacies for the distribution of

340B drugs. *Supra* at 6-7 & 24; *Novartis*, 102 F.4th at 460. "[B]ecause 340B does not dictate many

of the terms regarding manufacturers' obligation to offer and provide the drugs," Chapter 288

could not conflict with any "offer-and-acceptance mechanism" Congress may have created for the

340B Program, let alone demonstrate any clear or manifest intent to "confer on manufacturers a

right to be free from all state law requirement regarding drug distribution to patients[,]" including

through contract pharmacy arrangements. *See Frey*, 2025 WL 2813787, *8, *11.

None of the cases on which PhRMA relies involved anything remotely similar to the

situation here. ECF 11-1 at 24. Each is a variation on themes already discussed: federal statutes

regulating areas of uniquely federal interest, such as foreign affairs, *see, e.g., Crosby v. National

Foreign Trade Council*, 563 U.S. 363, 373 (2000), or state regulations in direct conflict with or

posing an obstacle to accomplishment of federal objectives. *E.g., Barnett Bank v. Nelson*, 517

U.S. 25 (1996) (irreconcilable conflict between what federal law permitted and what state law

forbade); *Gade,* 505 U.S. at 99 (federal law preempted any state regulation of occupational, health,

or safety unless submitted for OSHA's prior approval, which was not obtained); *Wisconsin Dep't*

*of Indus., Labor & Human Relations v. Gould, Inc.,* 475 U.S. 282, 286 (1986) (direct conflict where state law imposed penalty different than penalty imposed by federal law for same violation).

PhRMA attempts to fabricate a conflict between state and federal law by bestowing on manufacturers a unilateral right to fill the gaps left by Congress' silence to the exclusion of any state regulations. *See supra* at 6-8 & 24-25. No such right exists. PhRMA's contrary argument exaggerates and misstates the holdings in *Novartis* and *Sanofi. See* ECF 11-1 at 31 (citing *Novartis*, 102 F.4th at 459-64; *Sanofi*, 58 F.4th at 704-06). Contrary to PhRMA's assertion that "under federal law, manufacturers are explicitly permitted" to impose delivery conditions, *id.* at 31, what those cases *actually* held is that Section 340B is "silent about delivery" and thus does not empower HRSA to enforce, as a matter of federal law, a requirement that drug manufacturers honor particular distribution models. *Novartis*, 102 F. 4th at 462 (quoting *Sanofi*, 58 F.4th at 703).

Far from advancing PhRMA's position, that statutory silence is fatal to PhRMA's argument: although federal "statutory silence [does] not impliedly prohibit *otherwise* lawful conduct," *Novartis*, 102 F.4th at 460 (emphasis added), neither does it imply that "the clear and manifest purpose of Congress" was to render that private conduct totally immune from any regulation by the States. *In re Pharm. Indus. Average Wholesale Price Litig.*, 582 F.3d at 173. "Pre-emption law ... cautions us against finding that a congressional act pre-empts a state law through silence." *Schafer v. Am. Cyanamid Co.*, 20 F.3d 1, 6 (1st Cir. 1994) (Breyer, C.J.) (citing *Maryland v. Louisiana,* 451 U.S. 725, 746 (1981)); *see Virginia Uranium, Inc. v. Warren*, 587 U.S. 761, 791 (2019) (Ginsburg, J., concurring in the judgment) ("[Plaintiff] contends that [Virginia's] mining ban conflicts with the 'delicate balance' federal law has struck between promoting nuclear power and ensuring public safety. ... But the Federal Government does not regulate the radiological safety

of conventional uranium mining on private land, so federal law struck *no* balance in this area.") (emphasis in original).

To the contrary, "and particularly in [cases] in which Congress has legislated in a field which the States have traditionally occupied," such as "medicine and its associated costs[,]" courts proceed on the "assumption that the historic police powers of the States were not to be superseded by the Federal Act[.]" *In re Pharm. Indus. Average Wholesale Price Litig.*, 582 F.3d at 173, 177 n.14; *see CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69, 86 (1987) ("The longstanding prevalence of state regulation in this area suggests that, if Congress had intended to pre-empt all state laws … it would have said so explicitly."). That "negative presumption is even stronger when the state law at issue creates a remedy unavailable under federal law[,]" as Chapter 288 does here. *Schafer*, 20 F.3d at 6 (citations omitted).

PhRMA also wrongly asserts that Chapter 288 allegedly requires "manufacturers to provide 340B-priced drugs in circumstances where federal law does not[.]" ECF 11-1 at 23. Chapter 288 does no such thing. As already shown, Chapter 288 does not change the ceiling price Congress established for the 340B Program, which drugs are eligible for 340B pricing, which patients are considered "patients of the covered entity", nor the set of covered entities that can legally obtain 340B pricing from manufacturers. *Supra* at 27-28. All of these matters remain subject to federal law and are unaffected by Chapter 288. *See Skrmetti,* 2025 WL 1805271, at *12 ("The primary problem with the plaintiffs' position is that neither [their] policy nor [the challenged state law] says anything about the *pricing* of 340B drugs; both entirely concern the *delivery* of 340B drugs.") (emphasis in original).

PhRMA gets no further by asserting that Chapter 288's restriction on contract-pharmacy delivery conditions "expands the scope of manufacturers' 340B obligations and fundamentally

34

alters the bargain struck by Congress with manufacturers for participation in 340B, Medicare, and Medicaid." ECF 11-1 at 24. To show that Chapter 288 places impermissible obstacles in the 340B program's path, PhRMA needs to offer much more than its own subjective interpretation of the 340B program's proper scope. First Circuit (and Supreme Court) precedent makes plain that "[i]nvoking some brooding federal interest or appealing to a judicial policy preference should never be enough to win preemption of a state law[;]' ... [t]hus, 'a litigant must point specifically to 'a constitutional text or a federal statute' that does the displacing or conflicts with state law.'" *Association to Pres. & Protect Loc. Livelihoods v. Sidman*, 147 F.4th 40, 50-51 (1st Cir. 2025) (quoting *Virginia Uranium, Inc. v. Warren*, 587 U.S. 761, 767 (2019) (citations omitted)). Because neither the "text [nor] structure" of Section 340B actually addresses delivery conditions or the use of contract pharmacies, PhRMA's reliance on the supposed terms of an invisible and inchoate Congressional bargain is an illegitimate attempt "to elevate abstract and unenacted legislative desires above state law[.]" *Virginia Uranium*, 587 U.S. at 778 (citations omitted). "[U]nfounded speculation about the federal government's implicit intentions ... may not ground a finding of obstacle preemption." *Capron,* 944 F.3d at 27-28.

Furthermore, PhRMA's assumption that state laws like Chapter 288 may result in more drugs being eligible for 340B pricing presents no conflict with the 340B Program because there is "nothing in 340B to suggest that Congress intended to limit the number of patients for whom covered entities may prescribe drugs at the discounted rate." *Frey*, 2025 WL 2813787, *11; *supra* at 2-3; *see Johnson & Johnson Health Care Sys. Inc.*, 2025 WL 1783901, at *13 ("Allowing covered entities these choices is not a defect, but by design."). Notably, the legislative history contains an emphatic statement that Section 340B, apart from its express provisions regarding duplication and diversion, "does not limit the amount of drugs that a 'covered entity' may procure

for purposes of receiving price reductions" from a manufacturer that has entered into a PPA. H.R. Rep. No. 102-384(II) (1992) at 14. Nor is there any basis to find a "clear and manifest" congressional intent to restrict eligibility for 340B Program pricing to only those patients who pick up their medications at pharmacies located in the "immediate vicinity" of the one pharmacy approved by the manufacturer, as PhRMA's members require. *See Frey*, 2025 WL 2813787, *11; *see also* ECF 11-3 at ¶ 13 (Amgen policy requires that contract pharmacy must be located within 40 miles of covered entity's parent site); ECF 11-4 at ¶ 12 (UCB policy imposes same 40-mile limitation).

### 2. "*Access to Claims Data*"

Next, PhRMA alleges that Chapter 288 conflicts with Section 340B because it "restricts the collection of claims data" from covered entities by manufacturers. ECF 11-1 at 25. According to PhRMA, this restriction creates an insurmountable obstacle to its members' ability to effectively use HRSA's Administrative Dispute Resolution ("ADR") scheme because claims data "is essential to access the federal audit process" that manufacturers must pursue "before initiating ADR." *Id.* at 25-26.

Yet again, PhRMA impermissibly attempts to transmute statutory silence into preemptive intent. *See* Ex. 1 at 56:20-21 ("340B does not expressly require covered entities to provide manufacturers with data."). Nothing in the text of Section 340B affirmatively authorizes drug manufacturers to extract claims data from covered entities as a condition of providing 340B pricing. In no sense did Congress' silence affirmatively authorize drug manufacturers to impose a claims data condition on covered entities—let alone render drug manufacturers' ability to impose such a condition on covered entities sacrosanct against any exercise of the States' traditional

authority over medicine and pharmacy. *See Sanofi* 58 F.4th at 699 ("[C]ourts must resist the urge to fill in words that Congress left out.").

Moreover, PhRMA's characterization of claims data as the essential prerequisite for a federal audit or ADR proceeding is simply inaccurate. Contrary to PhRMA's breathless assertion that "[c]laims data *is this very 'documentation'* that is essential to access the federal audit process", ECF 11-1 at 26 (emphasis in original), "nothing in the federal program has ever *required* covered entities to provide claims data (or 'clarification') or other documentation to drug manufacturers upon demand, yet the ADR system has nonetheless been in place and functioning adequately for many years in the absence of any such requirement." *Skrmetti*, 2025 WL 1805271, at *16 (emphasis in original). Just as in that case, PhRMA has "not actually shown that [its members] need claims data and the other documentation they purport to need in order either to request an audit or to attempt to resolve a dispute in good faith before proceeding to ADR[,]" and has "presented no evidence that … drug manufacturers have ever been denied the ability to conduct an audit upon request or that they have been required to submit the kind of claims data they claim to need in order to substantiate a request for an audit." *Id.; Frey*, 2025 WL 2813787, *12 ("The 340B program and the audit process have existed for many years, but Plaintiffs have not identified cases where a manufacturer had requested but been denied an audit due to a lack of relevant claims data"). "Rather, claims data is more likely to be precisely the documentation that would be reviewed *in the course of conducting an audit.*" *Skrmetti*, 2025 WL 1805271, at *16 (emphasis in original).

Under federal law, "only 'reasonable cause' is required to support a manufacturer's request for an audit, to 'ensure that the audits are performed where there are valid business concerns.'" *Id.* (quoting 1996 Guidance at 65,406). "HRSA itself observed in April 2024 that the standards for

initiating a manufacturer audit 'are *not overly burdensome* [and do not] present any barriers to a manufacturer's ability to perform an audit of a covered entity.'" *Id.* (quoting ADR Rule at 28,646) (emphasis in original). "Significant changes in quantities of specific drugs ordered by a covered entity and complaints from patients/other manufacturers about activities of a covered entity may be a basis for establishing reasonable cause." 1996 Guidance at 65,406. Indeed, in 2024, PhRMA member Johnson & Johnson was able to initiate HRSA-approved audits of "several covered entities that had sizable increases in their 340B purchasing" after voicing its concerns to HRSA regarding "significant increases in 340B utilization." *Johnson & Johnson Health Care Sys. Inc.,* 2025 WL 1783901, at *3 (citing *Or. Health & Sci. Univ. v. Engels*, No. 24-cv-2184, 2025 WL 1707630 (D.D.C. June 17, 2025). Chapter 288 also affirmatively provides for a potential source of information through the detailed (and public) annual reports that covered entities must submit to Rhode Island's Auditor General regarding each "340B covered entity's participation in the program during the previous calendar year[.]" R.I. Gen. Laws § 5-19.3-6. And "a good faith request by the manufacturer for documents from a covered entity—again, so long as it has an articulable basis for believing that the entity is not in 'compliance with the prohibitions against drug diversion and the generation of duplicate drug rebates and discounts with respect to drugs of the manufacturer'—would satisfy its obligation to 'attempt in good faith to resolve the matter' before accessing the dispute resolution system." *Skrmetti*, 2025 WL 1805271, at *16 (quoting 1996 Guidance at 65,406, 65,410). Accordingly, PhRMA's imagined conflict is "too speculative" to demonstrate any likelihood of success. *Frey*, 2025 WL 2813787, *12.

PhRMA also asserts that Chapter 288's claims data restriction "impermissibly limits manufacturers' ability to utilize what is known as a rebate model" under which covered entities would pay manufacturers full price for 340B drugs up-front before submitting claims data to

receive a post-purchase rebate for the difference between the full price and the 340B discount price. ECF 11-1 at 25; *see, e.g., Johnson & Johnson Health Care Sys. Inc.*, 2025 WL 1783901 at *3. Once again, PhRMA's argument falls flat, as the purported conflict between Chapter 288's and HHS's Rebate Pilot Program is completely illusory.

To begin with, PhRMA's blanket assertion that the rebate model mechanism is "explicitly contemplated under the federal statute," *id.*, omits the crucial fact that drug manufacturers are not authorized to employ a rebate model until and unless they have received specific approval from the Secretary to do so. *See Eli Lilly & Co. v. Kennedy*, No. 24-cv-03220, 2025 WL 1423630, at *11 (D.D.C. May 15, 2025) (HRSA "posted a blanket warning that 'implementing a rebate proposal without Secretarial approval would violate Section 340B(a)(1) of the Public Health Service Act.'" (quoting Health Res. & Servs. Admin., 340B Drug Pricing Program, https://www.hrsa.gov/opa (last updated Apr. 2025)).

Indeed, HRSA's notice announcing a Rebate Pilot Program plainly states that rebate models represent a material change to the way that the 340B Program has functioned since its inception. *See* 90 Fed. Reg. 36,163. "Whereas the 340B program has traditionally operated as an upfront discount program" in which covered entities purchase 340B drugs from manufacturers at the discounted price, "under a rebate model, a covered entity would pay for the drug at a higher price upfront and then later receive a post-purchase rebate that reflects the difference between the higher initial price and the 340B price." *Id.* Because the adoption of rebate models requires "Secretarial approval" and "could fundamentally shift how the 340B Program has operated for over 30 years," HHS proposed a limited pilot program focused on a very narrow subset of ten high-priced drugs in 2026 for which there may be novel discount-nonduplication considerations. *Id.* at 36,163-64.

If PhRMA's members wished to implement a new rebate model consistent with the Rebate Pilot Program, they were required to submit a satisfactory plan to HHS by the deadline of September 15, 2025; HHS then made any approvals by October 15, 2025, "for a January 1, 2026 effective date." 90 Fed. Reg. at 36,164. But there is no indication in the record that PhRMA members Amgen and UCB, on which PhRMA relies to assert its own standing to challenge Chapter 288, have received or even sought such approval under the Rebate Pilot Program. *See* ECF 11-3 (Decl. of Amgen's Patrick Costello); ECF 11-4 (Decl. of UCB's Jay Janco). PhRMA cannot rely on the announcement of a fledgling regulatory regime as evidence that Section 340B itself implicitly protects its members' recent practice of requiring claims data as a condition of 340B discounts for *all* drugs, including those not covered by the recently announced Rebate Pilot Program. Nor can PhRMA show an actual or imminent risk of conflict arising from its members' hypothetical participation in the Rebate Pilot Program.

More importantly, even if any of PhRMA's members *do* eventually participate in the Rebate Pilot Program, covered entities will then be *required* by HHS to provide manufacturers with limited set of pharmacy claims data elements for certain drugs to obtain 340B rebates on those drugs. *See* 90 Fed. Reg. at 36,165 (requiring any "data requested" as part of a proposed rebate model "be limited to only" certain specified "readily available pharmacy claim fields"). PhRMA affirmatively concedes that this data will be required by HHS. *See* ECF 11-1 at 27 ("To avoid duplicating price reductions, this scheme requires identifying when a specific drug is acquired at the 340B price, a burden CMS places on manufacturers."). Chapter 288 does not restrict manufacturers' ability to enforce conditions that are actually "required by federal law as a condition of 340B participation." R.I. Gen. Laws § 5-19.3-5(c); *see id.* § 5-19.3-9(b) ("Nothing in this chapter is to be construed or applied to be in conflict with ... [a]pplicable federal law and

related regulations."); *cf. Weiser,* No. 25-cv-1847-WJM-KAS, at 24 (no conflict where state law provided similar carve out for 340B Program data required by federal law). And because the same is true for manufacturers' ability to require the provision of claims data or documentation that is actually "required by the Centers for Medicare and Medicaid Services" ("CMS"), *id.* § 5-19.3-3(a)(5), PhRMA also cannot manufacture any conflict out of whatever "burden CMS places on manufacturers" to submit data under the "new IRA Medicare Drug Price Negotiation Program[.]" ECF 11-1 at 27.

Thus, *by its own terms*, the Act will pose no obstacle to manufacturers' ability to participate in the Rebate Pilot Program. There is no current or even *potential* conflict between the Act and the conditions of any rebate model manufacturers may adopt under the Rebate Pilot Program, and the novelty of that limited-scope program cuts against PhRMA's claims about the conditions manufacturers are already authorized to impose on covered entities under federal law — or the supposed necessity of claims data for meaningful access to the audit process. *See, e.g.*, *Johnson & Johnson Health Care Sys. Inc.,* 2025 WL 1783901, at *3 (noting that PhRMA member Johnson & Johnson was able to successfully initiate audits of several covered entities even without the claims data it sought to obtain through its unapproved rebate model). "The existence of a hypothetical or potential conflict is insufficient to warrant the preemption of the state statute." *Concannon*, 249 F.3d at 77 (quoting *Rice v. Norman Williams Co.*, 458 U.S. 654, 659 (1982)).

### 3.  *"The Rebate Model"*

Next, PhRMA asserts that Chapter 288 is preempted because it "bar[s] manufacturers from utilizing the very rebate models that are contemplated by federal law and by HHS." ECF 11-1 at 29. To the extent that this argument is not completely duplicative of PhRMA's prior argument that Chapter 288 "seeks to ban the federal government's Rebate Model Pilot Program" through its

claims data restriction, *id.* at 28, it appears to rest on PhRMA's convoluted reading of specific provisions of Chapter 288 in a manner that is designed to conjure up conflict where none exists. *See id.* at 29 (quoting R.I. Gen. Laws §§ 5-19.3-3(a)(2), (11)).

If a manufacturer receives approval from HHS to adopt a rebate model for certain of its drugs, and conducts itself in accordance with the terms approved by HHS, the manufacturer would not run afoul of Chapter 288. Chapter 288 draws a clear distinction between the actual requirements of federal law under Section 340B (including with respect to any rebate models specifically approved by the Secretary), and manufacturers' attempts to unilaterally impose additional discriminatory conditions on covered entities without federal approval. Specifically, Chapter 288 only prohibits manufacturers from "impos[ing] additional terms or limitations *not required by federal law* as a condition of 340B participation." R.I. Gen. Laws § 5-19.3-5(c) (emphasis added). For purposes of the Rebate Pilot Program, any "additional terms or limitations" would be "required by federal law" and thus not prohibited by Chapter 288. After all, the primary purpose of the Rebate Pilot Program is to address specific scenarios in which a manufacturer is required to impose limited claims data conditions on covered entities to fulfill both its 340B participation obligations and its obligations under the IRA. *See* 90 Fed. Reg. at 38,165 n.1; *id.* at 38,166 (outlining permissible "reporting requirements" manufacturers can impose on covered entities and requiring manufacturers' platforms "use only the data required to effectuate the rebate"). Accordingly, where the submission of pharmacy claims data by a covered entity is "required by federal law" under an HHS-authorized rebate model, that condition is not prohibited by Chapter 288 and there is no conflict between Chapter 288 and the Rebate Pilot Program.

PhRMA also points to other provisions of Chapter 288 to manufacture a supposed conflict between the state law and HRSA's rebate pilot program. But the provisions PhRMA cites, *see* ECF

11-1 at 29 (citing R.I. Gen. Laws §§ 5-19.3-3(a)(2), (11)), do not squarely apply to arrangements under the Rebate Pilot Program. Rather, those provisions are intended to cover a range of "discriminatory actions" in which a health insurer, pharmacy benefit manager, manufacturer, other third-party payor, or its agent treats a 340B covered entity differently than a "non-340B entity" "with respect to *reimbursement* to a 340B covered entity for 340B drugs." R.I. Gen. Laws §§ 5-19.3-3, -3(a)(2), -3(a)(11) (emphasis added); *see also Reimbursement,* Black's Law Dictionary (12th ed. 2024) (defining "reimbursement" as "[t]he act or an instance of paying back a sum of money; indemnification"). PhRMA has failed to introduce any specific arguments about how these provisions, which are primarily focused on "discriminatory actions" by third-party payors like health insurers, bar the rebates authorized under HRSA's rebate pilot program. Traditional canons of statutory interpretation also caution against PhRMA's desired reading. *See AbbVie v. Fitch*, 2024 WL 3503965, at *13 ("[Mississippi's law] states that it should not be construed to conflict with federal law, … and the Court must apply the presumption against preemption to construe state laws not to conflict with federal law when possible, … [and] will not read [Mississippi's law] to accidentally conflict with federal law."). Moreover, even if HHS-authorized rebates were a form of "reimbursement," R.I. Gen. Laws §§ 5-19.3-3, the claims-data or documentation conditions imposed on covered entities as a direct result of the Rebate Pilot Program would be expressly permitted by § 5-19.3-3(a)(5) because they are "required by" HHS and CMS.

### 4. *"The Federal Enforcement Regime"*

Finally, PhRMA recycles yet another argument unsuccessfully raised in a previous action, asserting that Chapter 288's enforcement scheme conflicts with Section 340's own. *Compare* ECF 11-1 at 29 ("S.114 also conflicts with the exclusive federal administrative and enforcement regime.") with *McClain*, 95 F.4th at 1144 ("PhRMA argues that [Arkansas' law] creates its own

oversight and enforcement scheme ... [and] argues this contravenes HHS's exclusive 340B jurisdiction."). In *McClain*, the Eighth Circuit rejected that argument, holding that Arkansas' law was not preempted because "the Arkansas Insurance Division" and "HHS [had] jurisdiction over different disputes" involving the distinct requirements imposed by the state and federal laws. 95 F.4th at 1144.

PhRMA does not identify any legal error in that analysis or distinguish the case. Nor could it: yet again, its argument rests on a blatant misreading of Chapter 288. *See id.* ("Again, PhRMA conflates the two statutes."). As multiple courts (including this Court) have recognized, state laws like Chapter 288 do not alter the contents of the federal 340B enforcement program or run afoul of *Astra's* holding by creating a new private right of action to enforce Section 340B itself. *See* Ex. 1 at 56:17-19 ("As for enforcement, the Rhode Island law seeks to enforce state law in the form of a Deceptive Trade Practices Act claim, not federal law."). Instead, state laws like Chapter 288 create separate and complementary state law obligations, complete with their own state enforcement schemes. *See, e.g.*, *Novartis v. Fitch*, 738 F. Supp. 3d at 751 ("[Mississippi's law] addresses delivery and Section 340B does not, so adjudications under [Mississippi's law] will not interfere with federal enforcement of Section 340B's compliance mechanisms."); *McClain*, 645 F. Supp. 3d at 901 ("[T]he penalties that may be assessed for violations of [Arkansas' law] relate to activities outside the scope of the 340(B) Program's enforcement procedures[.]"); *Weiser*, No. 25-cv-1847-WJM-KAS, at 18-19 (state law enforcement provisions aimed at areas outside the scope of 340B statute).

Under our federal system of dual sovereignty, that is entirely permissible. "Ordinarily, the mere existence of a federal regulatory or enforcement scheme," even ones far more "detailed" than Section 340B, "does not by itself imply pre-emption of state remedies." *English*, 496 U.S. at 87.

Nor are state remedies "pre-empted solely because they impose liability over and above that authorized by federal law." *Id.* at 89 (quoting *ARC Am. Corp.,* 490 U.S. at 105).

PhRMA also cannot conjure a conflict through its "preview [that] potential state enforcement proceedings" will involve manufacturers' assertion of "federal defenses," such as the defense that the hypothetical orders for which PhRMA's members have refused to provide covered entities with the 340B price "are not qualified under federal law for a 340B price."[11] ECF 11-1. Because Chapter 288 contemplates enforcement through the state-law mechanism of the DTPA, the Attorney General would need to bring that enforcement proceeding, and any petition to obtain civil penalties for violations, in Rhode Island Superior Court. *See* R.I. Gen. Laws §§ 5-19.3-8, 6-13.1-5, -1.8. Because a potential violation of Chapter 288 could only occur if the manufacturer had engaged in prohibited conduct "[w]ith respect to reimbursement to a 340B covered entity for 340B drugs," R.I. Gen. Laws § 5-19.3-3(a), or the prohibited discriminatory actions specified at R.I. Gen. Laws § 5-19.3-5, the questions of whether 340B covered entities and 340B drugs were involved or whether "the entity who ordered drugs was engaging in unlawful diversion or was otherwise ineligible for 340B discounts" under federal law, ECF 9-1 at 14, would represent threshold issues that the Superior Court would be "presumptively competent" to resolve by reference to the controlling federal law incorporated by reference in Chapter 288. *Tafflin v. Levitt*, 493 U.S. 455, 458 (1990).

PhRMA's apparent umbrage at the notion that state courts might consider questions of federal law is thus unavailing; "when a state proceeding presents a federal issue, even a pre-

---

[11] Notably, by acknowledging that the question of whether those hypothetical sales are "qualified under federal law for a 340B price" is an "essential threshold issue" for whether Chapter 288's provisions even apply, PhRMA has conceded that Chapter 288 does not "expand[]" the scope of Section 340B or "rework[] manufacturers' 340B obligations." ECF 11-1 at 30-31, 38.

emption issue, the proper course is to seek resolution of that issue by the state court." *Chick Kam Choo v. Exxon Corp.*, 486 U.S. 140, 149-50 (1988); *see Tafflin*, 493 U.S. at 458 ("[S]tate courts have inherent authority, and are thus presumptively competent, to adjudicate claims arising under the laws of the United States."). PhRMA's prediction that Chapter 288 will allow Rhode Island courts to "enforc[e] their own visions of 340B," ECF 11-1 at 30, is further refuted by the Act's provision that "[n]othing in this chapter is to be construed or applied to be in conflict with ... [a]pplicable federal law and related regulations[.]" R.I. Gen. Laws § 5-19.3-9(b). And threshold questions of 340B eligibility will be easily determinable by reference to the terms of PPAs and HRSA's list of covered entities, not in a vacuum or in the hyper-specific manner PhRMA envisions; indeed, according to HRSA, even if a covered entity is undergoing a federal audit after "reasonable cause" for alleged violations of Section 340B have been found, "[m]anufacturers must continue to sell at the statutory price during [an] audit process[;] ...[n]ot until the entity is found guilty of prohibited activity and a decision is made to remove the entity from the covered entity list, will the manufacturers no longer be required to extend the discount." HRSA, Manufacturer Audit Guidelines and Dispute Resolution Process 0905-ZA-19, 61 Fed. Reg. 65,406, 65,408 (Dec. 12, 1996).

More importantly, after threshold issues of federal law are resolved, the Superior Court's subsequent substantive decision as to whether a manufacturer's conduct violated the specific provisions of Chapter 288 would ultimately represent a determination of *Rhode Island* law; conversely, any determination by HHS as to whether the conduct of a manufacturer or covered entity was a violation of Section 340B's separate requirements would ultimately be a determination of a distinct *federal* question. The fact that Defendants would be enforcing state law, not federal law, distinguishes this case from *Astra*—which, as discussed, involved the lack of a private right

of action under federal law and which did not address preemption or states' ability, through legislation, to create distinct but complementary regulatory regimes. Any so-called "inconsistency" between findings that conduct violated Chapter 288 but not Section 340B would stem from the fact that Chapter 288, by design, regulates private conduct about which Congress was silent. Notwithstanding its attempt to concoct a nightmare scenario out of the routine workings of our federal system, PhRMA thus fails to show that separate proceedings to enforce the Act will create an insurmountable obstacle to Section 340B's own federal enforcement scheme.

The "teaching" of the Supreme Court's preemption decisions "enjoin[s] seeking out conflicts between state and federal regulation where none clearly exists." *English,* 496 U.S. at 90 (quoting *Huron Portland Cement Co. v. Detroit,* 362 U.S. 440, 446 (1960)). PhRMA mechanically "chants the conventional 'obstacle to accomplishment' mantra, [but] it does not point to the kind of clear conflict that would warrant such a finding," and has not shown a likelihood of success on its preemption challenge to Chapter 288. *Grant's Dairy,* 232 F.3d at 18.

## III.    PhRMA Fails to Demonstrate the Remaining Preliminary Injunction Factors

PhRMA's failure to show a likelihood of success on the merits of its federal preemption claim dooms its request for a preliminary injunction. *Ryan,* 974 F.3d at 18. Even apart from that, PhRMA's motion should also be denied because (1) it fails to demonstrate any risk of irreparable injury to its members and (2) the public interest weighs heavily in favor of allowing Chapter 288—which already went into effect on October 1, 2025—to remain in effect to avoid further harm to the health care safety net that the 340B Program was intended to strengthen. *See Benisek v. Lamone*, 585 U.S. 155, 158 (2018).

47

A.     **No Irreparable Injury**

PhRMA fails to show that its members—including Amgen and UCB, on which PhRMA specifically relies to assert its standing to challenge Chapter 288—will suffer any irreparable injury without the requested relief. *See* ECF 11-3; ECF 11-4. Although PhRMA invokes the looming specter of constitutional violations arising from the State's enforcement of Chapter 288, PhRMA cannot make "a sufficient showing of irreparable harm" by simply "alleging a deprivation of constitutional right[s]" without demonstrating why that allegedly imminent harm is in fact irreparable. *Public Service Co. of N.H. v. Town of West Newbury*, 835 F.2d 380, 382 (1st Cir. 1987). "Courts have largely rejected presumptions of irreparable harm except in the very narrow context of first amendment challenges." 9A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2948.1 (3d ed.); *see id.* ("An exception is that when there is an alleged deprivation of a constitutional right to free speech or freedom of religion, many courts find that no further showing of irreparable injury is necessary. This principle has not (for the most part) and ought not be extended beyond the first amendment context."). Indeed, even "the fact that [a plaintiff] is asserting First Amendment rights does not automatically require a finding of irreparable injury." *Rushia v. Town of Ashburnham*, 701 F.2d 7, 10 (1st Cir. 1983).

PhRMA has not adequately shown how its constitutional claims translate into real-world irreparable harm to its members. Nor can it; "the essence of the injury here is clearly economic." *Ocean State Tactical, LLC v. Rhode Island*, 646 F. Supp. 3d 368, 399 (D.R.I. 2022), *affirmed*, 95 F.4th 38 (1st Cir. 2024). "It is a longstanding axiom that 'economic harm in and of itself is not sufficient to constitute irreparable injury.'" *OfficeMax Inc. v. County Qwick Print, Inc.*, 709 F. Supp. 2d 100, 113 (D. Me. 2010) (quoting *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bishop*,

839 F. Supp. 68, 74 (D. Me. 1993)); *see* Ex. 1 at 59:3-4 ("[I]t is well accepted that economic harm is not irreparable harm.").

Here, the allegedly irreparable harms that PhRMA forecasts for Amgen and UCB are "price concessions", "compliance costs and lost resources," or potential "civil penalties" for noncompliance. ECF 11-1 at 31. All of those boil down to predictions of "lost revenue" or other financial costs, which are "entirely economic" harms that cannot support a finding of irreparable injury. *Ocean State Tactical, LLC*, 646 F. Supp. 3d 368, at 399; *see id.* at 400 (discussing "retail plaintiff['s]" predictions of the "loss of business revenue" and other "economic injuries" from being unable to sell large-capacity magazines and holding that "[n]one of [those] feared consequences constitutes irreparable harm"); *see also Renegotiation Bd. v. Bannercraft Clothing Co.*, 415 U.S. 1, 24 (1974) ("Mere litigation expense, even substantial and unrecoupable cost, does not constitute irreparable injury."); *Together Emps. v. Mass Gen. Brigham Inc.*, 32 F.4th 82, 86 (1st Cir. 2022) ("Appellants attempt to classify their injuries as irreparable by reframing the harm they suffer as the loss of things they can no longer afford. But artful pleading cannot not transform ordinary harm into the basis for an injunction."); *DiBiase v. SPX Corp*, 872 F.3d 224, 230 (4th Cir. 2017) ("[M]ere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay are not enough.").

While "even economic harm may be irreparable when it looms so large as to create a credible threat to the existence of the moving party's business[,]" *Semaphore Entertainment Group Sports Corp. v. Gonzalez*, 919 F. Supp. 543, 550 (D.P.R. 1996), that is not the case here. In 2024, Amgen's "total revenues increased 19% to $33.4 billion in comparison to the full year of 2023." https://www.amgen.com/newsroom/press-releases/2025/02/amgen-reports-fourth-quarter-and-full-year-2024-financial-results. UCB's revenues "increased to € 6.15 billion, a plus of 17%" in

2024 and are "expected to grow to "€ 6.5-6.7 billion" in 2025. https://www.ucb-usa.com/stories-media/UCB-U-S-News/detail/article/on-growth-path-a-decade-plus-strong-launch-execution-driving-company-growth. Because the sheer scale of those revenues eclipse the projected "millions of dollars in price concessions" and "hundreds of thousands of dollars determining how the requirements of S. 114 will be implemented," or any potential civil penalty PhRMA speculates may befall its members for violations of Chapter 288, PhRMA cannot actually show that its members will be at all hindered from investing "in research and development and other priorities" without an immediate injunction. ECF 11-1 at 31.

Although PhRMA also attempts to manufacture irreparable harm through the conclusory assertion that "manufacturers face reputational harm from having their federally-lawful policies branded unlawful" under Chapter 288's separate state law requirements, that argument is unavailing. ECF 11-1 at 32. *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12 (1st Cir. 1996), from which PhRMA cherry-picks the statement that reputational harm is "often held to be irreparable", *id.*, was a case in which the district court made specific factual findings that "the availability of a product line" manufactured by defendant Baccarat was sufficiently crucial to the "allure" of plaintiff Ross-Simons' bridal-registry business such that its absence would cause "injury to goodwill and reputation of plaintiff's business" because "[p]otential registrants, unable to include Baccarat crystal among their selections, may choose not to register at all with Ross–Simons, enlisting instead with a competitor who offers the full spectrum of desired products." *Ross-Simons*, 102 F.3d at 19-20; *see id.* at 20 ("Of particular interest for purposes of this appeal, several courts have recognized that the loss of a prestigious brand or product line may create a threat of irreparable injury if it is likely that customers (or prospective customers) will turn to competitors who do not labor under the same handicap."). PhRMA has made no comparable

showing, and *Ross-Simons* does not stand for the proposition that irreparable harm to a business's reputation is automatically presumed any time a newly enacted state law regulates that business's practices—especially in an industry as highly regulated as pharmaceuticals. *Cf. AbbVie v. Fitch*, 2024 WL 3503965 at *20 ("In 'an industry,' such as pharmaceuticals, 'that long has been the focus of great public concern and significant government regulation,' enhanced regulation where Congress was previously silent is foreseeable[.]") (quoting *Ruckelshaus v. Monsanto Corp.*, 467 U.S. 986, 1008-09 (1984)).

It is also relevant to the irreparable harm inquiry that PhRMA was evidently aware of Chapter 288 long before it was signed into law on June 27, 2025, especially given that its Motion refers to "S. 114," an earlier version of Chapter 288 that was introduced in January 2025. *See* ECF 1 at n.1; ECF 11. Yet, PhRMA inexplicably waited until October 1, 2025—the date that Chapter 288 went into effect, nearly eight months after S. 114 was first introduced, and nearly three months after Chapter 288 was signed into law by the Governor—to even file its Complaint, before then filing its motion for injunctive relief a week later on October 8, 2025. PhRMA's lackadaisical approach to seeking injunctive relief—filing *after* this Court rejected two earlier preliminary injunction motions premised on identical preemption claims and *after* Chapter 288 took effect—smacks of a manufactured emergency and "'undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury.'" *Wine & Spirits Retailers, Inc. v. Rhode Island & Providence Plantations*, 364 F. Supp.2d 172, 182 (D.R.I. 2005) (quoting *Jordache Enters., Inc. v. Levi Strauss & Co.,* 841 F. Supp. 506, 521 (S.D.N.Y. 1993)).

**B.     The Balance of Equities and Public Interest Heavily Favor Defendants**

Finally, the balance of the equities and the public interest weigh heavily in favor of the Defendants and the State of Rhode Island. In this inquiry, the Court must consider the "risk of irreparable harm to the party seeking the injunction, as balanced against the harm to the party opposing it, and the public policy interests implicated by the issuance (or not) of an injunction." *Harris v. Wall*, 217 F. Supp. 3d 541, 560 (D.R.I. 2016).

As previously discussed, PhRMA has failed to show that its members would suffer irreparable harm if enforcement of Chapter 288 is not enjoined; conversely, "[a]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301 (2012) (Roberts, C.J., in chambers) (quoting *New Motor Vehicle Bd. of Col. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers)). And again, the "mere fact" that PhRMA seek an injunction "on constitutional grounds does not decide [the] balance-of-the-equities inquiry[,]" particularly given the fact that PhRMA has not shown a likelihood of success on the merits. *Hanson v. D.C.*, 120 F.4th 223, 247 (D.C. Cir. 2024), *cert. denied*, No. 24-936, 2025 WL 1603612 (U.S. June 6, 2025); *see id.* ("To the contrary, this court must balance the equities of the parties and the public even when a party seeks to restrain the enforcement of an allegedly unconstitutional law.").

The public policy interests at stake also heavily favor the State—as this Court has already held. *See* Ex. 1 at 59:9-14 ("Even considering some economic impact on Plaintiffs due to Rhode Island law, when balancing that with the public's interest in a covered entity's ability to deliver low cost drugs, the Court finds that the public interest weighs heavily in favor of the state."). Rhode Island's General Assembly passed Chapter 288 "to protect a critical discount pharmaceutical program that enables safety-net hospitals, clinics and other health care agencies to provide care to

the most vulnerable Rhode Islanders." *Assembly protects 340B discount prescription program* (June 20, 2025), https://www.rilegislature.gov/pressrelease/_layouts/15/ril.pressrelease. inputform/DisplayForm.aspx?List=c8baae31-3c10-431c-8dcd-9dbbe21ce3e9&ID=375735. In the public interest calculus, Rhode Island's "interest in safeguarding its residents is paramount." *Does 1-6 v. Mills*, 16 F.4th 20, 37 (1st Cir. 2021). PhRMA has not shown—and cannot show—that the public interest would be advanced by an injunction allowing PhRMA's members to continue to engage in the same harmful conduct that both Chapter 288 *and* the 340B program were intended to address.

Contrary to PhRMA's unsupported assertion that "[t]his case does not concern reduced pricing for patients[,]" the record shows that the actions that drug manufacturers have taken to throttle Rhode Island covered entities' ability to effectively utilize the 340B program have already had a materially detrimental impact on those covered entities and their patients. ECF 11-1 at 32. For example, and as the General Assembly noted after it passed Chapter 288, "Providence Community Health Centers, the state's largest community health center, announced in May [2025] it would lay off 70 staff members due to low Medicaid reimbursements and a $9 million loss in 340B funding over the last three years." *Assembly protects 340B discount prescription program* (June 20, 2025); *see* Ex. 5 (Letter from Merrill Thomas, President & CEO of PCHC) ("Another effect of [drug manufacturers'] restrictions has been the reduction of free medication access for our most at-risk patients, a consequence that directly affects the health and well-being of our community.  If these restrictions persist, we will be left with no choice but to make further painful reductions to both staffing and critical services.").

Another Rhode Island covered entity, Comprehensive Community Action Program, Inc., ("CCAP") has suffered ongoing financial harm that "directly affects [its] capacity to provide

comprehensive care to underserved patients[;] ... [a]s an example, many patients refuse referrals or testing due to transportation issues and [340B] revenue allows CCAP to offer ride share options to eliminate this barrier and connect these patients to necessary care and potential life saving testing." Ex. 6 (Letter from Chris Mansfield, President & CEO, CCAP). Due to drug manufacturers' recent, "coordinated effort[s] to restrict" covered entities' ability to participate in the 340B program, many other covered entities in the State faced similar predicaments. Ex. 4 (Letter from Rilwan K. Feyisitan, Jr., President & CEO, EBCAP); *see, e.g.*, Ex. 7 (Letter from Chuck Jones, President and CEO of Thundermist Health Center) ("Thundermist lost more than $7 million in 2024 which contributed to the fiscal crisis we experienced at the end of 2024 and led to 125 people in Rhode Island losing their jobs. … Thundermist and our patients cannot wait. … [I]f [the Act] does not pass, we will continue to struggle to meet the needs of the most vulnerable residents of the State."); Ex. 2 (Letter from Christine Collins, SVP, Pharmacy and PeriOp Services, Brown University Health) ("[P]harmaceutical manufacturers have imposed unlawful restrictions in the contract pharmacy space … caus[ing] increased financial losses to a degree that safety-net providers are simply not positioned to continue absorbing without risking negative impacts on patient care and services.  Current restrictions result in approximately an immediate $20 million loss annually to Brown University Health[.] … All of these losses result in direct adverse impacts to patient care.").

The General Assembly passed Chapter 288 as a direct response to the damage that drug manufacturers' recent 340B policies have already inflicted on Rhode Island; as a result, PhRMA— which cannot even be bothered to acknowledge the real-world crises facing Rhode Island's covered entities and their patients, asserting instead that those covered entities "and their for-profit pharmacies" are reaping "windfall pricing benefits"—cannot seriously represent to this Court that

the balance of harms and public interest favor an injunction against Chapter 288's enforcement. ECF 11-1 at 32. For covered entities, and thus for the disadvantaged patients and communities those safety-net hospitals serve, the loss of several millions of dollars a year in 340B discount pricing can quite literally mean the difference between life and death; for PhRMA and its members, sums like that amount to rounding errors on a balance sheet. *See* https://www.amgen.com/newsroom/press-releases/2025/02/amgen-reports-fourth-quarter-and-full-year-2024-financial-results; https://www.ucb-usa.com/stories-media/UCB-U-S-News/detail /article/ on-growth-path -a-decade-plus-strong-launch-execution-driving-company-growth.

## CONCLUSION

For all of these reasons, PhRMA fails to establish that the "extraordinary and drastic remedy" of enjoining enforcement of a newly enacted state law aimed at protecting public health and safety is warranted. *See Peoples Fed. Sav. Bank*, 672 F.3d at 8–9. Consistent with this Court's prior reasoning and that of multiple other federal courts that have rejected identical challenges to state laws like Chapter 288, the Court should deny PhRMA's motion for a preliminary injunction.

Respectfully Submitted,

Defendants,

**PETER F. NERONHA, in his official capacity as Attorney General of the State of Rhode Island; DAVID A. BERGANTINO, in his official capacity as Auditor General of the State of Rhode Island**

**By:**

**PETER F. NERONHA**
**ATTORNEY GENERAL**

*/s/ Lionel Dutreix*
Lionel Dutreix (#10728)
James J. Arguin (#10972)
Jeff Kidd (#10416)
Lee Staley (#11049)
R.I. Office of the Attorney General
150 South Main Street
Providence, RI 02903
Telephone: (401) 274-4400
Facsimile: (401) 222-3016
ldutreix@riag.ri.gov

## <u>CERTIFICATION</u>

I, the undersigned, hereby certify that I have filed the *Objection to Plaintiff's Motion for Preliminary Injunction* within via the ECF System and that it is available for viewing and downloading on this 3rd day of November, 2025.

<i><u>/s/ James J. Arguin</u></i>